[No. 52156–5. En Banc. October 16, 1986.]

PAMELA ANN PORTER, *Individually and as Guardian, Respondent,* v. KAREN LEE COVER PORTER, *Individually, as Personal Representative, and as Trustee, Appellant.*

44

*Bogle & Gates,* by *Dale B. Ramerman,* for appellant.

*Charles P. Moriarty, Jr., Pamela A. Okano,* and *Margaret Doyle Fitzpatrick* (of *Moriarty, Mikkelborg, Broz, Wells & Fryer*), for respondent.

BRACHTENBACH, J.—This case involves issues concerning life insurance proceeds, community property, child support,

will revocation, removal of a trustee, attorney fees for guardians, and other attendant issues arising out of the divorce, debts and death of Guy Erwin Porter, Jr.

The trial court entered extensive findings of fact, conclusions of law, and a judgment, the details and effects of which will be considered hereafter. We reverse in part, affirm in part, and remand for further proceedings.

Guy Erwin Porter, Jr. (Porter) married Pamela Porter (Pam) in California in 1964. Their adopted son, Guy Erwin Porter III (Trey), was born in 1968. In 1974 Pam and Porter were divorced. The divorce decree incorporated by reference an interlocutory judgment of dissolution, entered upon the parties' stipulation.

The decree provided generally for child support payments of $125 per month, later increased to $190, until Trey reached the age of 21. The decree further provided that Porter was to maintain certain insurance on his life with Trey as beneficiary for as long as Porter's support obligation was to continue.

Two paragraphs of the decree dealt with the life insurance obligation. Paragraph 10 required Porter to maintain group life insurance "available through his employer"; and paragraph 11 specifically provided that Prudential Insurance Company policy 32–822–868, a cash value policy, was to be kept in force during the support obligation period.

At the time of the decree, Porter was a bank trust officer. He had "available through his employer" a $41,000 term insurance policy, and he owned Prudential policy 32–822–868 which had a face amount of $10,000. This total of $51,000 formed the basis of the trial court's finding that Trey was intended to be the beneficiary of $51,000 of insurance proceeds under the decree in the event Porter died before his support obligation was fulfilled.

In 1974, shortly after his divorce, Porter set up a trust for Trey. The trust property consisted of approximately $40,000 and included Prudential policy 32–822–868 and three additional Prudential cash value policies, each with a $10,000 face amount. Porter appointed his girl friend,

Karen Cover, as trustee. At that time he also executed a will and named Karen executrix.

In September of 1979, Porter and Karen moved to Seattle, where Karen began work as a nurse and Porter began employment as a trust officer at Seattle–First National Bank (Sea–First). Sea–First provided Porter with an annual salary of $25,900 and group term life insurance which was in the amount of $92,300 at the time of his death. Porter designated his estate as beneficiary of his Sea–First term policy.

Approximately 2 months after Porter began working for Sea–First, he and Karen were married. Fourteen months later, on December 17, 1980, Porter died in Seattle.

Shortly after Porter's death, Karen filed Porter's will for probate in Seattle. She was confirmed as personal representative, and an order of solvency was entered. Pursuant to her duties as executrix and trustee, Karen opened two accounts at Sea–First: a "trust" account and an "estate" account. The trust account consisted of the proceeds of the four cash value policies which Porter had placed in Trey's trust. Those proceeds amounted to approximately $33,600 as of March 31, 1983. The estate account consisted almost exclusively of the proceeds of the Sea–First term life policy, or $92,300.

Karen then began to spend money from the estate account, commingling estate funds with her own. She failed to keep adequate records. Moreover, many of her expenditures were payments of her separate debts. As of March 31, 1983, only $30,000 remained in the estate account.

Pam, Porter's first wife, filed a claim against the estate individually and as Trey's guardian. As guardian, Pam claimed the entire proceeds of the Sea–First term policy pursuant to the California divorce decree. After a 4–day trial, the court entered detailed findings of fact and conclusions of law. In general, the court concluded that (1) the intent of the divorce decree was to provide $51,000 in benefits to Trey upon his father's death; thus Karen should transfer sufficient funds from the estate account to the

trust account such that the latter should contain $51,000; (2) Karen had no community interest in the four Prudential policies held in trust for Trey or in the Sea–First term policy; (3) Karen should be removed as trustee; (4) Karen must return a $5,000 bequest which she received under the terms of the trust; (5) Pam is entitled to attorney fees and expenses incurred in litigation; (6) Karen wrongfully expended estate funds to pay her personal attorney fees; (7) Porter's will was not revoked under RCW 11.12.050; (8) Karen was not entitled to an award in lieu of homestead. Judgment was entered upon these findings and conclusions on July 20, 1983, and the parties appealed.

I

INSURANCE

The major issues to be considered involve the interests in life insurance proceeds. The divorce decree imposed two specific obligations relating to insurance upon Porter as father. These obligations are embodied in paragraphs 10 and 11 of the divorce decree:

(10) For so long as he shall be obligated to provide support for said minor child, respondent shall maintain group life insurance available through his employer on his life and shall designate Guy Erwin Porter III as beneficiary thereof until such child attains age 21.

(11) Respondent shall designate and maintain Guy Erwin Porter III as beneficiary of Prudential Insurance Company Policy 32 822 868 until such child attains age 21, and respondent shall keep said policy in force during said period and shall not hypothecate or borrow upon said policy.

Clerk's Papers, at 78. Porter violated both of these provisions. He named his estate rather than Trey as the beneficiary of the group policy. Furthermore, he designated the trust as the beneficiary of the Prudential policy. Finally, Porter borrowed against the Prudential policy.

Notwithstanding Porter's violation of these provisions, the trial court found that the insurance provisions were intended by the parties as security for support. The insur-

ance was "to provide the continued support of, and a college education for, Guy Erwin Porter III should his father die before he attained [the] age [of] 21." Clerk's Papers, at 7. No error is assigned to that finding. The court further construed paragraphs 10 and 11 to require Porter to carry a total of $51,000 in life insurance as security for support. The $51,000 represents the $10,000 Prudential policy specifically designated in paragraph 11 plus the $41,000 of group life insurance, referred to in paragraph 10, which was "available through [Porter's] . . . employer" at the time of the divorce decree. Appellant widow assigns no error to the finding that $51,000 was the amount intended as security for support.

Respondent first wife cross–appeals, contending that the amount to which Porter's son is entitled should be the entire proceeds of the group policy. Thus the parties agree that *at least* $51,000 of the insurance proceeds should be for Trey's benefit. Accordingly, the trial court directed Porter's estate to pay $17,400, which represents the difference between the $51,000 earmarked as security for support and the $33,600 balance in the trust account as of trial.

Two insurance issues are raised by the trial court judgment: (1) May the $33,600 remaining proceeds of the cash value policies be properly characterized as Porter's separate property and thus trust property free from Karen's claims of a community interest? and (2) May the decree's requirement that Porter maintain Trey as beneficiary of a term life policy to secure his support obligation defeat Karen's community property interest in the proceeds of that policy?

### 1. Cash Value Policies

Porter owned four Prudential cash value insurance policies. All four were used to fund the trust for his son. The premiums on these policies were paid in part by the community of Porter and Karen from the date of their marriage on November 10, 1979, to Porter's death on December 17, 1980. Karen asserts an interest in the proceeds of these policies in proportion to the amount of premiums paid with

community funds. The trial court found she had no interest in these policies.

When insurance premiums are paid for with community funds the proceeds are community property. *Occidental Life Ins. Co. v. Powers,* 192 Wash. 475, 74 P.2d 27, 114 A.L.R. 531 (1937). Ownership of the proceeds will be separate property or community property in proportion to the percentage of total premiums which have been paid with separate or community funds. *See* Cross, *The Community Property Law in Washington (Revised 1985),* 61 Wash. L. Rev. 13, 43 (1986). Based on this "apportionment" rule, the Porter/Karen community interest in the four policies is presumptively $9,355.72, with Karen's one–half amounting to $4,677.86.

The presumption that $9,355.72 of the $37,065.79 face value of these four policies consists of community property must be overcome by clear and convincing proof that the property is separate property, with the burden of overcoming this presumption on the party asserting the separate nature of the property. *Estate of Madsen v. Commissioner,* 97 Wn.2d 792, 650 P.2d 196 (1982). The trial court found that Karen had no community property interest in the Prudential policies because the character of the insurance policies as community property had been changed to separate property. We agree.

█ █ The "character [of property] may be changed . . . by some form of estoppel." *In re Estate of Madsen,* 48 Wn.2d 675, 677, 296 P.2d 518 (1956). "An estoppel is a preclusion by act or conduct from asserting a right which might otherwise have existed, to the detriment and prejudice of another who, in reliance on such act or conduct, has acted upon it." *Tucker v. Brown,* 20 Wn.2d 740, 834, 150 P.2d 604 (1944), quoting *Reynolds v. Travelers Ins. Co.,* 176 Wash. 36, 45, 28 P.2d 310 (1934).

In this case, Karen listed all four policies as Porter's separate property in the probate inventory. This inventory was filed on June 2, 1981, nearly 2 years prior to trial of Pam's action. Pam relied on this inventory and devoted no effort

toward establishing the policies' separate character. As a result of Karen's act of listing these policies as Porter's separate property, and Pam's justifiable reliance upon that act to her detriment, Karen is now estopped from asserting a community interest to which she would otherwise be entitled. Accordingly, the proceeds of the four cash value policies, which now total approximately $33,600, comprise trust property under the terms of Porter's trust for Trey. We affirm that portion of the trial court's findings which determine that Karen has no interest in the cash value policies.

## 2. Term Policy

Subsequent to the time of trial of this case, this court adopted the risk payment doctrine for characterization of term insurance proceeds. *Aetna Life Ins. Co. v. Wadsworth,* 102 Wn.2d 652, 689 P.2d 46 (1984). Under this doctrine, the character of funds used to pay the most recent premium determines the character of the entire proceeds of a term life insurance policy. *Wadsworth,* at 659. *See also* Cross, 61 Wash. L. Rev. at 43.

In this case, Porter obtained group life insurance through his employer, Sea–First. As part of Porter's employment benefits, the bank paid the insurance premiums. When insurance premiums are an essential part of employment and are paid by an employer to a married employee, the premiums constitute community earnings. *Stephen v. Gallion,* 5 Wn. App. 747, 749–50, 491 P.2d 238 (1971), *overruled on other grounds in Aetna Life Ins. Co. v. Wadsworth, supra.* It is not clear from the record whether the premiums were paid monthly or annually. In any event, the last premium, which purchased the death benefit, was paid either during the last month or the last year of Porter's life. Porter was married to Karen during the last 14 months of his life. Thus it follows that the Porter/Karen community purchased the term policy, and the community is presumptively entitled to the entire proceeds of $92,300 as community property. *See Small v. Bartyzel,* 27 Wn.2d

176, 180, 177 P.2d 391 (1947).

The question then becomes whether, and to what extent, a prior decree requiring Porter's son to be named as a beneficiary of that policy can defeat the community interest in the proceeds. We hold that an antenuptial obligation to maintain a minor child as beneficiary of a term life insurance policy as security for support may not invade the interest of a subsequent community in that policy. We reiterate the general rule stated in *Aetna Life Ins. Co. v. Wadsworth, supra* at 662: A beneficiary named in a term insurance policy will be entitled to the proceeds "to the extent that the present spouse's community property rights are not invaded." Where, as here, the term policy is community property, and the surviving spouse is not named beneficiary, the community property interest to which such surviving spouse is entitled amounts to one–half the proceeds of the policy. The decedent spouse may dispose of his or her one–half interest. *See Francis v. Francis,* 89 Wn.2d 511, 516, 573 P.2d 369 (1978).

In reaching this result, we note first that no question is raised regarding the validity of the insurance provision which was part of the agreement between Pam and Porter and incorporated in their divorce decree. Indeed, both this court and the Court of Appeals have upheld similar security–for–support provisions, as long as the father's obligation to maintain his children as beneficiaries on his life insurance ceases when his support obligation ceases. *See Sutherland v. Sutherland,* 77 Wn.2d 6, 459 P.2d 397 (1969); *Riser v. Riser,* 7 Wn. App. 647, 501 P.2d 1069 (1972).

In determining the extent to which a minor beneficiary such as the one in the instant case is entitled to these term insurance proceeds, we may analyze the insurance obligation under two theories. First, because the insurance requirement involves security for child support, it is analogous to a child support obligation. Second, because the provision requiring insurance was negotiated and agreed to by the divorcing couple, it is in the nature of a contract

provision. Whether considered as a child support obligation or a contractual obligation, such a provision potentially conflicts with community property principles.

Viewed as a child support obligation, the insurance clause presents a clash of policies with which this court has previously been faced. On one hand, the antenuptial responsibility for child support must be met by an obligated parent. *Van Dyke v. Thompson,* 95 Wn.2d 726, 730, 630 P.2d 420 (1981). On the other hand, "community assets are not liable for the separate debts of a spouse." *Van Dyke,* at 730; *Fisch v. Marler,* 1 Wn.2d 698, 97 P.2d 147 (1939). In resolving the conflict, we said that the subsequent marriage of a divorced husband and father does not relieve him of his prior support obligations. *Fisch,* at 716. However, such obligations will not be enforced to the extent they inequitably invade the community property rights of the present wife. Such rights would indeed be inequitably invaded if we refused to recognize the present community's interest in a term insurance policy and awarded the entire proceeds to a minor beneficiary pursuant to a security–for–support provision.

In arguing that her son Trey is entitled to the entire proceeds of the term policy, Pam, as guardian, relies on two Court of Appeals decisions: *Crozier v. Equitable Life Assur. Soc'y of United States,* 33 Wn. App. 828, 658 P.2d 39 (1983); *Puckett v. Puckett,* 41 Wn. App. 78, 702 P.2d 477 (1985). The facts in *Crozier* are substantially similar to those of the present case, in that a father was required under a divorce decree to maintain his minor children as irrevocable beneficiaries under his group life policy. Before his death, the father remarried, naming his second wife as beneficiary. With only a brief discussion of the community property principles involved, the *Crozier* court held that the children were entitled to all the proceeds because the father had entered his subsequent marriage as an "encumbered spouse." As a result of her husband's "encumbered spouse" status, the second wife acquired no interest whatsoever in the policy.

The *Crozier* result is erroneous. We note at the outset that the case was decided prior to our holding in *Aetna Life Ins. Co. v. Wadsworth, supra.* After *Aetna,* the present wife in *Crozier* would be entitled to one–half the proceeds of the policy, assuming the community was responsible for the most recent payment.

We similarly disapprove of the Court of Appeals holding in *Puckett v. Puckett, supra,* to the extent it allows decedent's antenuptial obligation to provide insurance as security for support to defeat the present wife's entire community property interest in the proceeds of a term policy.

Viewed as a contractual obligation, the security–for–support provision likewise cannot prevail over community property principles. In *Neeley v. Lockton,* 63 Wn.2d 929, 932, 389 P.2d 909 (1964), we stated the general rule that contracts will control only to the extent that they are not inconsistent with the community property law. The community property law in question involves insulation of a nonobligated spouse from the separate contractual obligations of the other spouse, and hence, protection of the integrity of community property. Cross, 61 Wash. L. Rev., at 116.

In *Nichols Hills Bank v. McCool,* 104 Wn.2d 78, 701 P.2d 1114 (1985), we specifically ruled that the community property interest of a spouse was not subject to separate contractual debts. We found it necessary to protect the community against what was, in effect, an unauthorized contractual gift of an obligated spouse. *Nichols Hills,* at 87–88. Similarly, we find it necessary in this case to protect the community property interests of Porter's widow against her husband's antenuptial contractual obligation.

In the present case, Porter disposed of his one–half interest in the policy by naming his estate as beneficiary and then designating his son's trust to take the remainder of his estate under his will. Regardless of whether the estate, the insured, or a named beneficiary is designated by decedent, the proceeds may be placed beyond the reach of

creditors by RCW 48.18.420. That section provides generally that term insurance proceeds are exempt from debts of the insured and others having a right under the policy. *See also* Fletcher, *Adapting the Uniform Probate Code to Washington Marital Property Law*, 7 Gonz. L. Rev. 261, 275 n.52 (1972). As a result of application of RCW 48.18-.410, the term insurance proceeds, including Porter's one-half, or approximately $46,000, is subject to ultimate disposition free from claims of creditors. The ultimate disposition of the remainder of Porter's estate, under the residual clause of his will, is to the trust, of which Trey is beneficiary. This $46,000, less administrative expenses, together with the $33,600 cash value insurance proceeds currently funding the trust, comprise approximately $79,000 to be held in trust for Porter's son. To the extent that Karen has expended those funds comprising Porter's one-half of the term insurance proceeds, thus preventing the movement of those funds from Porter's estate into the trust, she is personally liable. Upon remand, a complete accounting will be necessary to determine the nature of the expenditures Karen made from these insurance proceeds.

Appellant Karen argues that $17,400 is the largest sum for which she may be held personally liable. She reasons, and the trial court so found, that at the time of the decree, $51,000 was intended by Pam and Porter as security for Porter's obligation to support and educate Trey. Since $33,600 is currently in the trust as partial fulfillment of this obligation, the $17,400 needed to bring the trust to $51,000 represents her maximum liability.

In view of our finding that (1) the term insurance proceeds were community property, and Porter was entitled to dispose of approximately $46,000, or one-half the proceeds of the term policy; (2) the effect of RCW 48.18.410 is to allow his one-half of the proceeds of the policy, with his estate as beneficiary, to pass free from the claims of creditors; and (3) under the residuary clause of Porter's will the remainder of his estate passes to his son's trust, it is unnecessary for us to determine the exact amount of insur-

ance coverage intended by the parties under the decree. We remand for a determination of (1) the precise amount of Porter's one–half of the term insurance proceeds; (2) the difference between this amount and the available funds in the estate account; (3) judgment against Karen to the extent she wrongfully expended funds from Porter's one–half of the insurance proceeds.

## II

Several lesser issues are raised by this appeal: (1) Was Karen properly removed as trustee? (2) Did the trial court err in requiring Karen to return a $5,000 bequest which she received in her capacity as trustee? (3) Was the finding that Pam had incurred $27,079.63 in prosecuting this action and subsequent judgment for that amount against Karen supported by substantial evidence? (4) Did the trial court err in ordering Karen to pay attorney fees amounting to $9,589.96 from her personal funds? (5) Was Porter's will revoked pursuant to RCW 11.12.050? (6) Did the trial court err in failing to allow Karen an award in lieu of homestead under RCW 11.52?

### 1. Removal as Trustee

■ The trial judge removed Karen as trustee and appointed a successor trustee. Conclusion of law 39. The court, however, made no specific finding of fact to support that conclusion. We nevertheless find that the trial court properly removed Karen under the following analysis: A trustee may be removed by a superior court and a successor trustee appointed for reasonable cause. RCW 11.98.039 (formerly RCW 30.99.050). Reasonable cause may include conflict of interest between the trustee and the trust beneficiaries. *See Tucker v. Brown*, 20 Wn.2d 740, 769, 150 P.2d 604 (1944). "It is the duty of a trustee to administer the trust in the interest of the beneficiaries." *Tucker*, at 768.

In this case, Karen asserted a community property interest in the cash value policies which were intended to fund the trust. In so doing she set up a conflict of interest between herself and Trey, the trust beneficiary, thereby

failing in her duty as trustee to administer the trust in Trey's best interest. Regardless of any other possible breaches of fiduciary duty, this breach alone supports Karen's removal as trustee. We affirm her removal.

## 2. $5,000 Bequest

Karen was the beneficiary of $5,000 to be paid from the trust to her in her capacity as trustee when insurance proceeds were collected. Those proceeds were collected, and $5,000 was distributed to Karen. The court entered a conclusion of law, reflected in the judgment, that Karen should return the $5,000. There is no finding of fact to support that conclusion.

In her oral opinion, the trial judge referred to the $5,000 as a fee. It is clear from the language of the trust, however, that the $5,000 was a specific bequest, not a fee for services. We are cited to no authority which mandates the return of a specific bequest under a trust instrument, regardless of whether the trustee, as recipient of the bequest, is ultimately removed. Accordingly, we reverse the trial court's conclusion that Karen should return the $5,000.

## 3. Guardian's Attorney Fees

Pam had incurred legal fees in the amount of $27,079.63. The trial court awarded judgment in the amount of $9,589.96 in favor of "Pamela Ann Porter, as Guardian of the Estate of Guy Erwin Porter III" against Karen, individually. Clerk's Papers, at 11.

Guardians may obtain attorney fees incurred in vindicating the interests of their wards. Such fees are to be fixed by the court as deemed just and reasonable. RCW 11.92.180.

There is no question that Pam, as Trey's guardian, is entitled to attorney fees which she incurred to secure the moneys due her son. However, it is clear from the record that Pam did not sue as guardian only. She also asserted a community property interest on behalf of herself individually, in the cash value policies which funded the trust. Clerk's Papers, at 40. There is no finding or conclusion as to Pam's individual claim, yet the claim is dismissed in the

judgment. Whether such dismissal is with or without prejudice we do not know. In any event, Pam is not entitled to attorney fees under RCW 11.92.180 for suing to vindicate her own rights.

Regrettably, no record was provided us regarding the probate or guardianship proceedings. We do not even know if the guardian's suit was authorized by the court. In addition, we find no evidence of a court order fixing the guardian's attorney fees as required by RCW 11.92.180. There is no segregation between plaintiff's status as a plaintiff individually and as guardian for the child. There is no determination regarding whether there was a conflict between plaintiff's position individually and as guardian. Finally, there is no proof as to whether a guardian ad litem was needed or appointed, RCW 11.88.090, in view of this possible conflict. The court, on remand, must make these determinations.

### 4. Karen's Attorney Fees

Although it is unclear from the findings, conclusions, and judgment, an additional $9,589.96 was apparently assessed against Karen for legal expenses which she incurred in defending herself against Pam's lawsuit. Karen paid this amount with estate funds. There is no finding as to the nature of the services for which that $9,589.96 was paid. Billings by Karen's attorneys show charges for legal services of $9,589.96. Exhibits 52 and 64. Some billings are headed "Re: Guy Erwin Porter Estate". Over half were billed under the caption "Pamela Porter v. Karen Porter". It is obvious that some of these billed services related to Karen's individual liability and some related to legitimate estate proceedings.

It is undisputed that the executrix of an estate may not use estate funds for her individual debts. *In re Estate of Bonness,* 13 Wn. App. 299, 535 P.2d 823 (1975). To the extent Karen so used estate funds, she is personally liable. However, on this record we are unable to determine what portion of the $9,589.96 was properly paid out of estate

funds for estate services. On remand, this determination must be made.

## 5. Will Revocation

Karen contends that Porter's 1974 will, executed 5 years before their marriage, was revoked under RCW 11.12.050. RCW 11.12.050 provides generally that marriage subsequent to the execution of a will results in revocation of that will unless the surviving spouse "be provided for in the will".

In *In re Estate of Steele,* 45 Wn.2d 58, 273 P.2d 235 (1954), we held that merely naming the future wife as a contingent beneficiary met the terms of the statute. In this case, under Porter's will, items of personal property were specifically left to Karen. The residue of the estate was also left to Karen, although it is unclear what that residue would be in light of incorporation in the will of the terms of the trust. Karen was also named beneficiary of the trust residue if Trey were to predecease his father or fail to survive full distribution, leaving no issue. In short, there were both specific and contingent bequests in the will itself and certain conditional bequests under the trust. Under the rationale of *In re Estate of Steele, supra,* and the facts of this case, we hold that Karen was provided for in the will.

## 6. Award in Lieu of Homestead

Karen assigns error to the failure of the court to allow her an award in lieu of homestead pursuant to RCW 11.52. However, Karen merely alleges in her pleadings that a petition was filed. She offered no proof of compliance with the detailed requirements of the statute. Furthermore, there is no finding of fact, no conclusion of law and no judgment relating to an award in lieu of homestead. It is not an issue properly proved or presented on appeal, so we are precluded from ruling on it.

The judgment is affirmed in part and reversed in part as set forth herein. The matter is remanded for further

proceedings consistent with this opinion.

DOLLIVER, C.J., and UTTER, DORE, PEARSON, ANDERSEN, CALLOW, GOODLOE, and DURHAM, JJ., concur.

Appeal dismissed April 16, 1987.