[No. 9492–4–II.   Division Two.   December 2, 1987.]

FIRST INTERSTATE BANK OF WASHINGTON, *Respondent,* v. WILLIAM B. LINDBERG, *Appellant.*

*Edward M. Lane, Paula K. Tuckfield,* and *Johnson, Lane & Crawford,* for appellant.

*Elvin J. Vandeberg* and *Kane, Vandeberg, Hartinger & Walker,* for respondent.

WORSWICK, J.—In 1966, Hilding and Isabel Lindberg created an inter vivos trust naming First Interstate Bank (then known by another name) as trustee. The Lindbergs placed into the trust almost all of their community property, worth about $11 million and consisting of real estate, securities and personal property. The Lindbergs amended the trust instrument twice during Hilding's lifetime. The trust provided that if Hilding died first, the trustee was to hold and manage the trust assets, pay income to Isabel during her lifetime, and make a scheduled distribution of the remaining assets upon her death. The distribution schedule allocated a substantial portion of the final distribution to William Lindberg, Isabel's and Hilding's son.

When Hilding died in 1971, the Bank divided the trust into the "deceased spouse's share" (the 00 account) and the "surviving spouse's share" (the 02 account) in accordance with the terms of the trust. The assets initially were divided by allocating one-half interest in each asset to each account. However, in order to raise cash to pay Hilding's

death taxes, the Bank later sold all of the 00 account's real estate, including the interest in the family home, to the 02 account. Thereafter, all of the real property except the family home was sold to third parties. Isabel had prior notice of these sales and was instrumental in causing them.

After Hilding's death, Isabel several times amended the trust as it applied to her share. She stated, in the eighth and last amendment (her sixth amendment), that "since the execution of all but the Seventh Amendment to said Living Trust, the Trustor has been alienated by the statements and conduct of William B. Lindberg, so that the Trustor no longer wishes him as an heir, beneficiary or devisee of her trust estate; . . ." She then directed that her interest in the family home be distributed to Irene Prescott, her sister–in–law.

When Isabel died in December 1982, a dispute arose, primarily instigated by William, as to how the trust assets should be distributed. To resolve the conflict, the Bank filed a declaratory judgment action, naming as defendants all of the residual beneficiaries. William generally contested the Bank's interpretation of the trust, and he counterclaimed against the Bank for trust mismanagement and negligence. Also, he specifically acknowledged in his answer that he had contested the proposed distribution to his former wife, Barbara, and he affirmatively prayed that the court determine that she was not entitled to any distribution.

The trial court tried the case in three phases: (1) issues concerning trust interpretation; (2) issues concerning the interest of William's former wife, Barbara; and (3) issues concerning trust management. In phase one, the court held that the trust agreement gave Isabel the power to amend the distribution schedule as to her share. It also held that in her will Isabel had exercised a power of appointment given her by the trust. In phase two, the court held that Barbara was a trust beneficiary in her own right, and that she had not waived her interest by entering into a property settlement agreement with William. The court held in

phase three that the Bank had failed to protect the trust's interest in Isabel's life insurance policies, to marshal certain assets into the trust accounts and properly to sell certain real property. It entered money judgments against the Bank accordingly. The court rejected all other contentions of negligence and mismanagement by the Bank. Finally, the court awarded the parties percentages of their attorney fees and costs and designated the specific trust accounts from which these should be paid.[1]

William appeals every finding of fact, conclusion of law and portion of the judgment adverse to his contentions against the Bank and Barbara Lindberg. The Bank cross-appeals the court's conclusions and judgment concerning

---

[1]The trial court allowed the following:

| | |
|---|---|
| First Interstate Bank | 17% of its attorneys fees, 15% of its costs from principal of the residuary trust estate of the surviving spouse. |
| | 68% fees, 60% costs, from principal of the residuary trust estate of the deceased spouse. |
| Prescotts | 80% fees & costs from principal of the residuary trust estate of the surviving spouse. |
| | 20% fees & costs from principal of the residuary trust estate of the deceased spouse. |
| William Lindberg | $78,265 fees and costs, other than expert fees, from principal of the residuary trust estate of the deceased spouse. |
| | $31,306 fees and costs to be paid by the Bank. |
| | 25% of William Brown's expert fees to be paid by the Bank. |
| | 25% of Ed Greer's and William Brown's expert fees from principal of the deceased spouse's residuary trust. Balance of expert witness fees to be paid by William Lindberg individually. |
| Guardian ad litem | 50% of fees and costs from principal of deceased spouse's residuary trust. |
| | 50% from principal of surviving spouse's residuary trust. |
| Barbara Lindberg | Approximately $8,500 attorneys fees to be paid by William. |
| | 50% of remaining fees from income in deceased spouse's share, and |
| | 50% from principal account of deceased spouse's share. |
| Dorothy Engum | 50% of fees and costs from principal account of residuary trust estate of the deceased spouse. |

the insurance policies. We affirm on William's appeal except for one item; we reverse on the Bank's cross appeal. We will discuss most of the issues raised in phase one, both issues raised in phase two, and selected issues raised in phase three. As to any issues not discussed, we agree with the trial court's resolution and adopt the position of the responding party.[2]

### PHASE ONE: TRUST INTERPRETATION
### A. Amendments

William first contends that, because the trust became irrevocable when Hilding died, the trial court erred in holding that Isabel's trust amendments were effective. The court did not err.

William points to article 9 of the trust agreement as originally executed, which states:

### Amendment or Revocation

As long as both of the Trustors are living, they reserve the right, without the consent of the Trustee or any other person, to withdraw from the trust all or any portion of the trust property or any net income therefrom, to amend or revoke this instrument in whole or in part, but the Trustee's duties and responsibilities shall not be increased without its consent. Upon the death of either of the Trustors, or upon either being incapable of handling his own affairs, this agreement shall become irrevocable.

William correctly observes that this language makes the trust irrevocable. However, article 13 provides:

### Disposition of Surviving Spouse's Share

A. Income. Trustee shall pay such portions of the net income to the surviving spouse and at such times as he may request.

B. Principle.

1. In the event Wilmer Hilding Lindberg shall be the surviving spouse, he shall have the power to invade the principal at any time, in any amount, for his own benefit

---

[2]We have carefully reviewed the record in this case, consisting of a 2,500-page verbatim report of proceedings, over 350 exhibits, several volumes of clerk's papers and 73 pages of findings of fact and conclusions of law. We also waived the page limit for briefs and, as a result, received briefs totaling over 500 pages.

or for any purpose whatsoever. In the event Isabel Prescott Lindberg shall be the surviving spouse, the Trustee may invade the principal in order to maintain the surviving spouse in that standard of living to which she has been accustomed.

2. The remainder shall be distributed *as he or she shall appoint by his or her Last Will or as he or she may herein designate and upon his or her failure to appoint or designate, shall be added to the deceased spouse's share.*

(Italics ours.) William fails to distinguish between revocation and amendment. A trust can be irrevocable but still subject to amendment so long as the amendment does not accomplish the result of a revocation. *In re Estate of Tyler,* 109 F.2d 421 (3d Cir. 1940); *Avery v. Bender,* 119 Vt. 313, 126 A.2d 99 (1956). Amendment, not revocation, is what we have here. Isabel did not attempt to revest the trust assets in herself or otherwise to destroy the trust by amending it; she simply altered the distribution of her share of the assets. The distribution of Hilding's share was unaffected.

■ We are satisfied that the language of article 13(B)(2) empowers Isabel to amend the distribution of her assets as she did. First, the provision contemplates that the surviving spouse could designate his or her share beneficiaries at any time up through the probate of his or her will, because designation was to be *either* in the trust *or* in the will by exercise of a power of appointment. Reference to the power to designate in the trust would be superfluous had the trustors only intended that the surviving spouse have a power of appointment with no power to amend the trust. We prefer to construe the trust so as to give meaning to all words used. *Wagner v. Wagner,* 95 Wn.2d 94, 621 P.2d 1279 (1980); *Seattle–First Nat'l Bank v. Westlake Park Assocs.,* 42 Wn. App. 269, 711 P.2d 361, *review denied,* 105 Wn.2d 1015 (1985). Next, the existence in the trust of a power of appointment fortifies our conclusion, because it would be senseless to give the surviving spouse such a power while withholding the power to accomplish the same result by simply amending the trust. Finally, the language of article

13(B)(2) permitting designation of beneficiaries only could mean that such designation could be accomplished by amendment, because at the time the trust agreement was signed, a designation already had been made in the schedules, and it would have been pointless to refer any further to a designation that could not be accomplished by amendment.[3]

### B. Power of Appointment

William concedes that the trust agreement gave Isabel a power of appointment by will over her share of trust assets. Also, it is apparent that she attempted to exercise it because of her uncertainty as to the validity of her trust amendments. William contends that either she did not attempt to exercise it at all, or that her attempt to do so was ineffective. Although we need not discuss this issue because of our conclusion as to Isabel's power to amend the trust, we elect to do so. We hold that had the trust amendments been ineffective, Isabel's attempt to exercise the power of appointment would have been effective.

Isabel's will stated in part, as follows:

ARTICLE III

I have transferred to a Living Trust established with the Pacific National Bank of Washington, as trustee, all of my real and personal property, and it is my intent that said property shall be held, administered and distributed to my heirs and devisees as provided in said trust instrument, *and the unrevoked amendments thereto.*

ARTICLE IV

If I have failed to convey to my said Trustee any item of real or personal property and the same remains in my probate estate, *or in the event for any reason my Living Trust of September 28, 1966 and the First, Second,*

---

[3]William also argues that the trust agreement is a binding contract or mutual will between Hilding and Isabel. However, the trust expressly gave Isabel the right to amend her share as well as the power of appointment. The Bank correctly notes that because of that right to change the distribution scheme, Hilding and Isabel did not agree on the "ultimate disposition" of their property. Therefore, the trust was not a mutual will. *See Newell v. Ayers,* 23 Wn. App. 767, 769, 598 P.2d 3, *review denied,* 92 Wn.2d 1036 (1979).

> *Third, and Eighth Amendments thereto should be held to be invalid or inoperative, I direct my Executor hereinafter named, to distribute all my estate both real, personal and mixed to the [First Interstate Bank] as Trustees, with instructions to distribute the assets of said trust estate in accordance with the terms of said trust instrument of September 28, 1966 and the First, Second, Third and Eighth Amendments thereto.*

(Italics ours.) William contends that this language was not an effective exercise of the power because (a) there is no specific reference to the power as given by the trust, and (b) the language must be construed simply as "pouring over" into the trust Isabel's assets that were not already there. We disagree.

The law does require that the intent to exercise a power be clear. *Wachovia Bank & Trust Co. v. Hunt,* 267 N.C. 173, 148 S.E.2d 41 (1966). However, the will need not expressly mention the power if the intent to exercise it is manifested otherwise. 62 Am. Jur. 2d *Powers* § 47 (1972). References in the will to the property subject to the power or to the instrument creating it can supply the necessary intent to exercise the power. This is especially true when the testator's appointed interest is the only interest she can devise. Annot., *Power of Appointment—Execution,* 15 A.L.R.3d 346, 365–67 (1967). Isabel's intent was clear: her assets were to be distributed as she wanted them to be, either by the trust or by her will. She knew the trust gave her a power of appointment. She could not have intended to do anything but to exercise it, albeit on a contingent basis, should her trust amendments be found invalid.

It is true that article 4 of the will operated to "pour over" into the trust any remaining assets; the first sentence, preceding the comma, says as much. However, that is not all it says. The disjunctive "or," following the comma, makes plain the language that follows: all of the assets under Isabel's control were to be distributed in accordance with her intent as expressed in the trust as she had amended it.

PHASE TWO: BARBARA LINDBERG'S INTEREST

A. Barbara's Rights

The Bank proposed to distribute a share of trust assets to Barbara Lindberg pursuant to the following portion of article 15:

> H. All the rest, residue and remainder of the Trust Property shall be held by the Trustee in a special trust to be known as the "Residuary Trust Estate" and shall be administered with the trust powers set forth in Article VII and distributed in the following manner: . . .
> 2. The balance of the Residuary Estate shall be held by the Trustee and the net income therefrom shall be distributed in the following proportions and amounts: . . .
> (e) Seventy percent (70%) distributed as follows:
> To William B. Lindberg *and his wife, Barbara Lindberg,* or the survivor, 70% of such income, and 10% of said income to each of their children, namely, Martha Ann, William H., and Isabel.

(Italics ours.) William and Barbara were married in 1943 and divorced in 1977. A precipitating cause of this litigation was William's insistence that Barbara either had no rights under the trust or had waived any such rights by entering into a property settlement agreement. William now contends that the trial court erred in holding that Barbara was entitled to a distribution and that her rights were unaffected by the property settlement agreement. We find no error here.

■ William's argument comes down to the assertion that Barbara's rights under the trust were derivative, *i.e.,* arising from her relationship to him and having no vitality unless she remained his wife. This is not so. Although no Washington cases have dealt with the question, courts in other jurisdictions have held that a distributive provision in a will that identifies a beneficiary by name as well as by status confers the right to distribution upon the named person as an individual. *See In re Estate of McGlone,* 436 So. 2d 441 (Fla. Dist. Ct. App. 1983); *In re Estate of Breder,* 105 Misc. 2d 444, 432 N.Y.S.2d 441 (1980); *Porter v. duPont,* 41 Del. Ch. 336, 194 A.2d 565 (1963). Principles

of construction applicable to wills also apply to trusts. *In re Work Family Trust,* 260 Iowa 898, 151 N.W.2d 490 (1967); *Hart v. First Nat'l Bank,* 237 Miss. 1, 112 So. 2d 565 (1959). We adopt these principles and hold that Barbara's rights under the trust were personal to her and were not derivative.

William next argues that even if Barbara had an interest in the trust, she waived it by signing a property settlement agreement containing the following language:

> Except as herein provided, both Husband and Wife do hereby waive, release and quit claim to the other all rights or claims which he or she now has or may hereafter have *as* Husband, *Wife,* Widow or Widower, or otherwise, *by reason of the marital relationship now existing between the parties.*

(Italics ours.) This argument is quickly dispatched. The rights Barbara waived in the property settlement agreement were only those derived from her marriage. Her rights under the trust were personal to her, not derivative, and therefore were not waived.

## B. Barbara's Attorneys Fees

William next contends that the court erred in requiring him to pay Barbara a portion of her attorneys fees for litigating this issue. The property settlement agreement provided that

> In the event that either Husband or Wife *brings any action for the enforcement of the terms of this Agreement,* the prevailing party shall be awarded judgment against the other party, in addition to any other relief, for all costs and expenses incurred by the prevailing party, including a reasonable attorney fee.

(Italics ours.) William contends that this provision does not apply because he brought no action to enforce the agreement. We disagree.

Although William did not start this case as plaintiff, his answer admits that he was largely responsible for instigating it by resisting the Bank's proposed distribution. His pleadings specifically raised the issue as to the effect of the

property settlement agreement, and he prayed for relief on that basis. He was solely responsible for the litigation of that issue. Accordingly, we hold that he brought an action to enforce the property settlement agreement within the meaning of that agreement.

## PHASE THREE: TRUST MANAGEMENT

■ In this phase of trial, the court ruled on William's multiple contentions of mismanagement and breach of fiduciary duties by the Bank, as well as on an insurance issue that principally affects the Bank and Irene Prescott, and it awarded and allocated attorneys fees. Many of William's contentions are factual. As to these, we are satisfied that substantial evidence supports the trial court's findings in each instance. *See In re Snyder,* 85 Wn.2d 182, 185–86, 532 P.2d 278 (1975). We are also satisfied that the court correctly applied the law regarding all issues that we elect not to discuss.[4] We will discuss four issues: annual accountings; interest on a distribution to William; the insurance question; and the trial court's award of attorneys fees.

### A. Annual Accountings
Article 3 of the trust agreement provided, in part:

Accounting to Beneficiaries
Trustee shall render an annual accounting to each adult beneficiary and the legal guardian of any minor or incompetent beneficiary then receiving payments. . . .

William correctly contends that the trial court erred in holding that this language did not require that he be given an annual accounting. Contrary to the Bank's argument, this accounting requirement was not limited to adult bene-

---

[4]We elect not to discuss William's contentions concerning: the Bank's duty to retain specific real estate; the Bank's power to sell assets; the Bank's power to divide assets; sale by the Bank of assets from Hilding's share to Isabel's share; the Bank's failure to sell securities to pay taxes; sales of assets to third parties; the Bank's investment policy; the Bank's failure to notify William of proposed sales of assets; the status of Isabel's jewelry; the Bank's standard of care as trustee; the Bank's negligent draftsmanship of the trust agreement; whether the Bank should be removed as trustee; payment of dollar bequests from Hilding's share; and the propriety of Isabel's income account.

ficiaries actually receiving payments. The phrase "then receiving payments" only qualifies the last antecedent, "legal guardian." *State v. Lodge,* 42 Wn. App. 380, 711 P.2d 1078 (1985), *review denied,* 105 Wn.2d 1021 (1986).

However, the error was harmless. William does not and cannot show that receipt by him of annual accountings during Isabel's lifetime would have made any difference. He had no right to a distribution until her death, and, as the result of this litigation demonstrates, had he asserted a claim against the Bank for mismanagement, he would have achieved only a modest success.

### B. Interest on William's Cash Distribution

Article 15 provides for a $150,000 cash distribution to William upon the death of both trustors. This distribution was not made on Isabel's death. William contends that the trial court erred in holding that he was not entitled to interest on this amount from the time it was payable until payment. The Bank contends that interest is not payable because the distribution was a general legacy, not a specific monetary bequest, and that it was payable only from the residuary estate, citing *In re Estate of Eagle,* 5 Wn.2d 254, 105 P.2d 31, 109 P.2d 1072 (1940) and *In re Estate of Doepke,* 182 Wash. 556, 47 P.2d 1009 (1935). The Bank concedes that a specific monetary bequest would entitle the beneficiary to the interest earned on the bequest to the date of payment, but contends that no interest is payable here because this was a general legacy, payable out of the residuary estate. The Bank also claims that the delay in payment was justified because of the litigation.

We agree with the Bank that interest is not payable on a general legacy, but only on a specific monetary bequest; however, we agree with William that this distribution was such a bequest, and that he is entitled to the actual interest earned on this amount from the due date to the date of payment. Justification, if any, for nonpayment is irrelevant.

This bequest appears in article 15(B) of the trust, which lists five specific bequests to William. In article 15(H), a

separate section, the estate residue was defined and a detailed distribution thereof was provided for.

We reverse the trial court on this issue. On remand, the trial court shall determine and award interest on this bequest to William.

### C. Attorneys Fees

Finally, William, joined by the guardian ad litem, broadly attacks the trial court's award of attorneys fees and costs. His general position is that he was awarded too little, and that everyone else was awarded too much from trust assets. We conclude that the court's awards were reasonable and within its discretion.

■ The law relating to these awards was summarized in *Allard v. Pacific Nat'l Bank,* 99 Wn.2d 394, 406–07, 663 P.2d 104 (1983) as follows:

A trial court may allow and properly charge attorney fees to a trust estate for litigation that is necessary to the administration of the trust. *Peoples Nat'l Bank v. Jarvis,* 58 Wn.2d 627, 632–33, 364 P.2d 436 (1961); *Puget Sound Nat'l Bank v. Easterday,* 56 Wn.2d 937, 951, 350 P.2d 444, 354 P.2d 24 (1960). The award of attorney fees against the trust estate is vested in the discretion of the trial court. *Jarvis,* 58 Wn.2d at 632; *Tucker v. Brown,* 20 Wn.2d 740, 839, 150 P.2d 604 (1944). A trial court's discretion to award attorney fees, however, is not absolute. The court must determine the litigation is indispensable to the proper administration of the trust; the issues presented are neither immaterial nor trifling; the conduct of the parties or counsel is not vexatious or litigious; and that there has been no unnecessary delay or expense. *Jarvis,* 58 Wn.2d at 632. Furthermore, the trial court must consider the result of the litigation. G. Bogert, *Trusts and Trustees* § 871 (2d rev. ed. 1982).

The court's underlying consideration must be whether the litigation and the participation of the party seeking attorney fees caused a benefit to the trust. *Estate of Baird,* 135 Cal. App. 2d 343, 287 P.2d 372 (1955); *Kronzer v. First Nat'l Bank,* 305 Minn. 415, 235 N.W.2d 187 (1975). A trustee who unsuccessfully defends against charges of breach of fiduciary duties obviously has not caused a benefit to the trust. Therefore, a trial court

abuses its discretion when it awards attorney fees to a trustee for litigation caused by the trustee's misconduct. *Accord, Estate of Baird, supra; Ellis v. King,* 336 Ill. App. 298, 83 N.E.2d 367 (1949).

The trial court's allocation and award of fees and costs in this case reflects a "cautious exercise of discretion" (*Peoples Nat'l Bank v. Jarvis,* 58 Wn.2d 627, 632, 364 P.2d 436 (1961)), and a meticulous application of the *Allard* principles. Obviously, the litigation was necessary, indeed indispensable, to administration of the trust, for the ultimate distributions would not have been possible without it. The litigation was conducted with dispatch, without unnecessary delay or expense. The Bank was required to bear its own fees and costs, as well as those of William, in reasonable proportion to those matters as to which its acts were found improper.

In varying degrees, the participation of each party benefited the trust by aiding the trial court in resolving the problems inhibiting the final distribution. The trial court was exceptionally astute in measuring the benefit conferred on the trust by each party and the extent to which trifling assertions and vexatious behavior intruded.

We affirm the trial court's allocation and award of attorneys fees and costs with one exception. Because of our disposition of the insurance issue, discussed below, the Bank is entitled to charge the trust with all of its attorneys fees and costs attributable to this issue. On remand, the trial court shall make the necessary adjustment.

### D. Isabel's Life Insurance (Bank's Cross Appeal)

Article 1 of the trust agreement identified, as "Trust Property," all assets listed in schedule A, and stated that all such assets were community property. Schedule A listed four insurance policies on Isabel's life, coupled with the statement that "trustor retains custody of the policies[.]" The policies were purchased in 1947 and 1948; thereafter, the premiums were paid with community funds. In 1966 the Bank was named the beneficiary, but the policies were

never assigned to the trust. On Hilding's death, one–half of the policies' cash surrender value was included on his estate tax return. After Hilding's death, Isabel paid the premiums from her separate funds; on August 30, 1976, she made Irene Prescott the beneficiary. Irene received all of the insurance proceeds on Isabel's death.

The Bank's complaint alleged that Irene had received the insurance proceeds, and that William asserted a claim to them. William's answer averred that the proceeds belonged to the trust, and that the Bank's failure to collect them violated its duty as trustee. In the Prescotts' affirmative defense to this issue (erroneously labeled a counterclaim), it was averred that the Bank had advised Isabel that she was free to name the beneficiary of her choice.

The trial court held that the Bank had been negligent in failing to procure an assignment of the policies and in failing to collect one–half of the proceeds. It held the Bank liable to the trust for $243,454.76, representing that one–half. It also concluded that the Bank was barred from recovering this amount from Irene Prescott by failing to assert a claim within a reasonable time.

The Bank contends that the court erred, because the Bank had no duty to collect the proceeds. We agree.

By instrument dated November 18, 1966, article 9 of the trust agreement was amended to read as follows:

## IX

1. *Amendment or Revocation.* As long as the Trustors are both living, they reserve the right, without the consent of the Trustee or any other person, to withdraw from the trust all or any portion of the trust property or any net income therefrom, to amend or revoke this instrument in whole or in part, *and as to policies, terminate, dispose of, exercise any option granted therein, borrow on, change the beneficiary, receive dividends, surrender value or other benefits,* but the Trustee's duties and responsibilities shall not be increased without its consent. Upon the death of either of the Trustors, or upon either being incapable of handling his own affairs, this agreement shall become irrevocable.

2. *Trustee's Responsibility as to Policies. Trustee*

*shall not be responsible for the validity, enforceability or payment of any premiums, assessments or other charges on any policies, but shall safely keep any policies delivered to it.* Following the death of either of the Trustors, *Trustee shall use its best efforts to collect the proceeds of all policies according to their terms but shall not be required to take any legal proceedings unless indemnified therefor to its satisfaction. . . .*

(Italics ours.)

■ Although this amendment is hardly a model of clarity, we conclude, from a reading of the entire trust agreement as amended, that the policies in question did not—and were not intended to—come within the control of the Bank, and therefore that the Bank had no duty to collect proceeds that had become payable to a different beneficiary.

Although schedule A identifies the policies as trust property, it also specifies that the trustors would retain them; no other provision of the trust requires that the policies be assigned or physically transferred to the Bank. Article 5, prescribing the trustee's general powers, lacks any provision for enforcing a right to such assignment, if any existed.

While both were alive, the trustors were free to do anything at all with the policies. Thus, the Bank would have no way of knowing the status of the policies when the first trustor died. For this reason, the article 9 amendment absolved the Bank from all responsibility for the policies during the life of the insured, except for a duty to safeguard policies physically delivered to it. Consistent with this, the Bank's duty to collect proceeds applied only to policies under which it was the beneficiary. This is the only sensible reading of article 9(2), because the Bank was not required to sue to recover proceeds, and it strains credulity to suggest that it was required to collect the proceeds on behalf of a different beneficiary.

This is not to say that the trust has no interest in the proceeds of Isabel's policies. As a residuary beneficiary under Hilding's will, it presumably has an interest in any property in his estate. A share of the insurance proceeds is

such property, for it is well established that such proceeds are community property to the extent that the premiums have been paid with community funds. *See Porter v. Porter,* 107 Wn.2d 43, 726 P.2d 459 (1986); *Aetna Life Ins. Co. v. Wadsworth,* 102 Wn.2d 652, 689 P.2d 46 (1984); *Chase v. Chase,* 74 Wn.2d 253, 444 P.2d 145 (1968); *In re Estate of Leuthold,* 52 Wn.2d 299, 324 P.2d 1103 (1958); *Small v. Bartyzel,* 27 Wn.2d 176, 177 P.2d 391 (1947), *overruled in part on other grounds in Aetna Life Ins. Co. v. Wadsworth,* 102 Wn.2d 652, 657, 689 P.2d 46 (1984); *Farver v. Department of Retirement Sys.,* 29 Wn. App. 138, 629 P.2d 903 (1981); *Stephen v. Gallion,* 5 Wn. App. 747, 491 P.2d 238 (1971), *overruled in part on other grounds in Aetna Life Ins. Co. v. Wadsworth,* 102 Wn.2d 652, 689 P.2d 46 (1984). However, it is for the personal representative of Hilding's estate, not the Bank as trustee, to marshal the assets of Hilding's estate, and we are not presently confronted with any issues that might arise from such a collection effort. We reverse the $243,454.76 judgment against the Bank.

### ATTORNEYS FEES AND COSTS ON APPEAL
### A. Attorneys Fees

William, the Prescotts, the Bank, and the guardian ad litem have requested attorneys fees on appeal and have substantially complied with RAP 18.1. These requests shall be determined by the trial court on remand pursuant to the following instructions: the court shall (1) determine the reasonableness of each fee requested; (2) make such awards, if any, to William, the Prescotts, and the Bank that it considers reasonable and appropriate under the standards for fees discussed in this opinion; (3) award the guardian ad litem a reasonable fee in its entirety; and (4) allocate the source of payment of each fee awarded.

### B. Costs

For purposes of taxing costs in accordance with RAP Title 14, we make the following determinations (RAP 14.2):

1. The Bank has substantially prevailed on all issues

involving it raised in William's appeal;

2. Barbara Lindberg and the Prescotts have substantially prevailed on all issues involving them raised in William's appeal;

3. The Bank has substantially prevailed on its cross appeal.

Affirmed in part, reversed in part, as indicated herein. Remanded for further proceedings consistent herewith.

REED, C.J., and ALEXANDER, J., concur.

Reconsideration denied January 12, 1988.

Review denied by Supreme Court May 4, 1988.