[No. 35169. Department One. March 24, 1960.]

THE PUGET SOUND NATIONAL BANK OF TACOMA, *Respondent and Cross-appellant*, v. FOREST EASTERDAY *et al.,* *Appellants.*[1]

[1]Reported in 350 P. (2d) 444.

938

*Cameron Sherwood & William M. Tugman* and *Comfort & Comfort,* for appellants.

*The Attorney General* and *Robert F. Hauth, Assistant,* for respondent.

*Eisenhower, Hunter & Ramsdell* and *George M. Hartung, Jr.,* for respondent and cross-appellant.

DONWORTH, J.—On June 29, 1934, Joseph H. Easterday, a practicing attorney in the city of Tacoma, executed his last will and testament. After making several specific bequests to friends and relatives, the will provided in the tenth paragraph as follows:

"I give to the Puget Sound National Bank of Tacoma the balance of my estate in trust to be used as follows:

"To each patient that is discharged from the White Shield Home of Tacoma, after my death, I desire to give a sum not to exceed $150.00, the amount to be given to be determined by the Management of said Home and approved by my Executors. In the event that the said Home should be discontinued or for any other reason the Trust can not be literally carried out I direct that the French rule and doctrine by Cy-Pris be invoked."

The will named J. Bancroft Lawton and the Puget Sound National Bank of Tacoma as coexecutors. However, on April 11, 1936, Mr. Easterday executed a codicil wherein he altered some of the bequests to his relatives and friends and named Mr. Lawton as the sole executor of his estate, with the Puget Sound National Bank designated as the

alternate executor to serve in the event of Mr. Lawton's death or other incapacity prior to the closure of the estate.

Mr. Easterday died on April 24, 1936, and his will and codicil were duly filed for probate. Mr. Lawton was appointed sole executor for the estate.

The White Shield Home (hereinafter referred to as the home) had originally been incorporated as a separate legal entity about 1889, and it continued as such until 1891, at which time the corporation was dissolved and its activities and management of the home were undertaken by the Women's Christian Temperance Union. Historically, the home had been devoted exclusively to rendering aid, care, and guidance to unwed mothers with their first pregnancy.

Commencing in April, 1940, patients of the home began receiving financial assistance pursuant to the trust established under paragraph 10 of the will. Altogether, approximately $12,000 was paid out to patients of the home during the course of the administration of the estate at the request of the Women's Christian Temperance Union and upon the written approval of the executor, Mr. Lawton.

By court order, entered on June 14, 1951, the final report of the executor was approved, Mr. Lawton was discharged as executor, and the estate was closed. In his capacity as executor, Mr. Lawton had turned over, to the trust, property having a total value of $81,194.84, consisting of both personalty and realty. At the time of trial, the trust corpus had a book value of $89,778.74, and a market value of $99,504.52.

After the closing of the estate, payments from the trust were continued to patients of the home upon their discharge, following application by the Women's Christian Temperance Union and after the approval of the Puget Sound National Bank as trustee (hereinafter referred to as respondent). The amounts of such payments varied, according to the needs of the patients, from ten dollars to one hundred and fifty dollars.

In 1956, the home ceased operations after the state refused to renew its license. The Women's Christian Temperance Union informed respondent, by letter, that due to the closing of the home it no longer had any interest in the trust

fund, and thanked respondent for its co-operation over the years.

Respondent then instituted this declaratory judgment action against all known and unknown heirs of the deceased, the state attorney general, and the Women's Christian Temperance Union for the purpose of obtaining a judicial construction of the tenth paragraph of the will and to ascertain its duties and obligations as to the proper disposition of the undistributed assets in the trust.

The pleadings are too involved to be described herein in detail. It is sufficient to state that respondent filed a complaint and later an amended complaint. The known heirs filed an answer and a cross-complaint. The guardian *ad litem* for the unknown and minor heirs, who was appointed by the court, filed an answer. The Women's Christian Temperance Union failed to answer and was adjudged to be in default.

The case was tried to the court sitting without a jury. After a trial which lasted for three days, the trial court rendered an oral decision, made findings of fact and conclusions of law, and entered a judgment wherein it decreed:

"That Joseph H. Easterday created a charitable trust in paragraph TENTH of his Last Will and Testament for the benefit of that class composed of patients discharged from the White Shield Home which was operated by the WOMEN'S CHRISTIAN TEMPERANCE UNION OF WASHINGTON. That the charitable trust which has been properly managed by the Trustee, the Puget Sound National Bank of Tacoma, has not failed, even though the White Shield Home has ceased to operate, but rather the doctrine of cy pres is hereby invoked to maintain the trust. That the trust funds shall hereafter be used for the benefit of the unwed discharged patients of the Florence Crittenton Home, the Group Homes of Villa Maria Maternity Service of Catholic Children's Service and the Ackerson House operated by Associated Lutheran Welfare, all of said Homes being situated in King County, Washington, and all operated in the same manner as the former White Shield Home; provided, however, that payments shall be made only to unwed girls who are residents of Pierce County, Washington at the time of their admission to one of the Homes who are pregnant by their first pregnancy. That the Trustee, the Puget

Sound National Bank of Tacoma, or any successor trustee, is hereby directed to pay out of the funds of said trust in a manner recommended by the management of the foregoing homes; subject, however, to the approval of the Trustee; and provided further that no patient receive a sum in excess of $150.00."

The trial court also approved the fees paid by respondent to itself for services rendered as trustee through July 4, 1958, amounting to $5,098.04, and further held that respondent, the guardian *ad litem,* and appellants were entitled to attorneys' fees from the corpus of the trust fund in the sums of $3,500, $750, and $3,500, respectively, plus all of their statutory costs.

The heirs of decedent have appealed, and respondent has cross-appealed. The attorney general, being charged with the duty of representing the people of the state of Washington in matters involving public charities, was joined as a necessary party defendant and has filed a brief in this court in support of the trial court's judgment.

The case comes to us with nineteen assignments of error, sixteen of which relate to portions of the findings and the rejection of appellants' proposed findings. It is not contended that the evidence is insufficient to support the findings. Rather, most of the issues raised are legal, the principal question being whether the trial court exceeded its power in applying the *cy-pres* doctrine to the trust herein.

Basically, the position of appellants on this appeal is that the trial court applied prerogative *cy-pres* to uphold this charitable trust instead of judicial *cy-pres,* and that, since prerogative *cy-pres* does not exist in Washington or the United States, the trust must necessarily lapse and the corpus revert to decedent's heirs. The distinction between prerogative and judicial *cy-pres* will be brought out later in the opinion.

■■ Appellants contend that, even though the residue of the estate was conveyed to respondent in trust, respondent was a mere depository for the trust corpus and was simply a "nominal" trustee; that the Women's Christian Temperance Union and Mr. Lawton were intended by the

testator to be trustees in the full legal sense. It is then argued that the will vested in Mr. Lawton and the Women's Christian Temperance Union, as trustees, the sole discretion to determine the beneficiaries of the trust, so that, since the discharge of Mr. Lawton as executor of the estate and the dissolution of the home, there no longer remains anyone to determine the beneficiaries of the trust and, therefore, the trust has lapsed. Appellants here rely upon the rule as set forth by the Restatement of the Law of Trusts 1190, § 397, which reads:

" (2) If the settlor manifests an intention that the intended charitable trust shall not arise or shall not continue unless the person named by him acts as trustee, or if the purposes of the trust cannot be carried out unless the person named by him acts as trustee, the intended charitable trust fails unless the person named by him as trustee acts as trustee."

We have no quarrel with the rule just quoted. Our holding in *Chellew v. White*, 127 Wash. 382, 221 Pac. 3 (1923), upon which appellants rely, is in accord therewith. However, the rule has no application to this case.

In the *Chellew* case, *supra,* the terms of the will of Samuel Chellew bequeathed the residue of his estate to one S. C. White in trust,

" '. . . to be handled and used by him as trustee, *as he deems best, and to whom he may decide best,* for the use of orphans and widows, whose homes are in the two Parishes of St. Ives and Towednack, England, to be expended by him for the relief of worthy orphans and widows of the War with Germany.' " (Italics ours.)

We there held that the trust lapsed upon the death of the trustee, S. C. White, since the will vested in him the sole discretionary power to expend and distribute the trust property in the manner that *he deemed best and to whom he decided best* for the use of the orphans and widows of the class named. Mr. White had died leaving undistributed certain money on deposit in an English bank. His widow had been administratrix *de bonis non* of the Chellew estate.

In the *instant case,* paragraph 10 of the will, *supra,* grants discretionary power only with relation to the *amount* of

money that is to be given. Of course, the amount to be given would necessarily depend upon the particular financial needs of each patient being discharged from the home. However, no discretion was granted to either the Women's Christian Temperance Union or Mr. Lawton to expend the trust funds so as to benefit the patients of the home in such *manner* as they deemed best or for the benefit of those patients of the home whom they thought to be *worthy* or best entitled to the money. The discretion granted in the case at bar was extremely narrow, while that granted in the *Chellew* case, *supra,* was very broad.

Furthermore, in the *Chellew* case the testator made it clear that his will was to be ultimately expressed *solely* through S. C. White. As we shall point out in more detail later in this opinion, the narrow discretion granted in the instant case was not lodged exclusively in the Women's Christian Temperance Union and Mr. Lawton.

Paragraph 10 provides that the amount to be given each patient shall be approved by the testator's *executors.* The trial court was of the opinion that the use of the word "executors" was an error in draftsmanship on the part of the testator, and that the word "trustees" was intended. The trial court then found that respondent was the duly appointed trustee under the will and, therefore, it was the testator's intention that the approval of the amount of money to be given each patient was to be made by respondent.

There can be no doubt that respondent was duly appointed as trustee under the will and was made a "trustee" in the full legal sense of that word. Paragraph 10 grants the residue of the estate to respondent to hold *in trust,* and then directs respondent as to the disposition of the trust corpus. We cannot conceive of anything more the testator could have said that would have made respondent any more of a trustee. Although the Women's Christian Temperance Union, as manager of the home, and Mr. Lawton, as executor of the estate, may have been granted certain fiduciary powers under the will, such fact could in no way make respondent any less of a trustee.

■ Whether the trial court was correct in substituting the word "trustees" for the word "executors" so as to construe paragraph 10 as granting the power of approval to respondent is, in our opinion, immaterial. For the reasons stated below, we are convinced that it would not have made any difference to the testator if the power of approval were exercised by Mr. Lawton or by respondent.

Paragraph 10 was drafted as a part of the 1934 will, which named respondent and Mr. Lawton as coexecutors to serve without bond or court intervention. Thus, under the terms of the 1934 will, the power of approval was vested in *both* respondent and Mr. Lawton. In 1936, the testator executed a codicil whereby Mr. Lawton was appointed sole executor to serve without bond or court intervention, and respondent was named as alternate executor to serve without bond or court intervention. The codicil did not modify paragraph 10 in any respect, so that the word "executors" still appeared therein in its plural form, although the will had been changed so that it no longer provided for two coexecutors. It seems to us that the testator's failure to change the word "executors" to its singular form so that it would conform with his modification of the will from coexecutors to a single executor, indicates that it was his intention that the latter was still to have an equal voice with Mr. Lawton in the approval of the trust expenditures. The fact that both Mr. Lawton and respondent were directed to serve without bond or court intervention indicates that the testator reposed no special trust or confidence in Mr. Lawton but, rather, that he had equal confidence in both respondent and Mr. Lawton.

■ Even if we assume that, in eliminating respondent in his 1936 codicil as coexecutor, the testator intended also to remove the power of approval from respondent and vest it in Mr. Lawton alone, the testator still has failed to manifest an intention that the trust should fail unless such power of approval were exercised only by Mr. Lawton. On the contrary, we interpret paragraph 10 to mean that the testator contemplated that the trust was to continue after Mr. Lawton's death.

The will does not say that the trust expenditures shall be approved by Mr. Lawton, personally. Rather, it grants the power of approval to the testator's *executors*. If for any reason Mr. Lawton had not assumed the duties of executor upon the death of the testator, then respondent would have become entitled to serve in that capacity by virtue of its being named as the alternate executor in the 1936 codicil. As executor, the power of approval then would have been lodged in respondent.

Surely, the testator, as a lawyer, was well aware of such a contingency and, if he had desired that only Mr. Lawton should exercise the power of approval, he would have drafted his will accordingly.

■ Similarly, we find no merit in the contention that the will granted certain discretionary power solely to the Women's Christian Temperance Union. Paragraph 10 does not provide that the *Women's Christian Temperance Union* is to determine the amount to be given each patient. Rather, it states that such determination is to be made by the *management* of the home. The management of the home might well change from time to time, and certainly the testator was aware of this. The record indicates that the management of the home was conducted by a different organization before being undertaken by the Women's Christian Temperance Union.

■ As stated in 2A Bogert on Trusts and Trustees 192, § 391:

"The powers of charitable trustees are usually not held to be personal, unless *clearly* made so by the settlor. . . ." (Italics ours.)

■ It can hardly be said that the powers granted the Women's Christian Temperance Union and Mr. Lawton were *clearly* made personal to them in this case. On the contrary, we think such powers were clearly not personal, and we so hold.

■ Appellants next argue that the trial court applied prerogative *cy-pres* to uphold the trust instead of ju-

dicial *cy-pres*. Appellants then quote from 4 Scott on Trusts 2828, 2831, § 399.1, as follows:

" . . . At common law in England . . . there was a prerogative doctrine of cy pres as well as a judicial doctrine. Under the prerogative doctrine the Crown, as parens patriae, was permitted in certain cases to apply the property *for any charitable purpose it might select.* . . .
" . . . The power is an *arbitrary* one, and the king is not accountable for the manner in which he exercises it. The situation is quite different from that which arises in the exercise by the court of the judicial power of cy pres. *Such a power is exercised only for the purpose of carrying out what would probably have been in accordance with the intention of the testator.* For this reason the prerogative power has no place in American jurisprudence. . . . " (Italics ours.)

From the language italicized above, it is too clear for argument that the trial court applied judicial, and not prerogative, *cy-pres* to the trust herein. There was nothing *arbitrary* whatever about the trial court's action. On the contrary, after a trial lasting for three days, the court ascertained the intent of the testator, and then directed that the trust funds be applied to that purpose which would most nearly effectuate the testator's intent as expressed in his will.

Appellants further argue that not even judicial *cy-pres* can be applied to this case.

In *Horton v. Board of Education of the Methodist Protestant Church,* 32 Wn. (2d) 99, 201 P. (2d) 163 (1948), we quoted from Scott on Trusts as follows:

" 'Where it clearly appears that the testator intended that the property should be applied only to the *particular purpose which failed,* or for the benefit of a *particular association or corporation which was dissolved,* it has been held that the doctrine of *cy pres* is not applicable and that the property reverts to the heirs or next of kin of the settlor.' " (Italics ours.) 3 Scott on Trusts 2112.

Later, in the same opinion, we quoted from *Duncan v. Higgins,* 129 Conn. 136, 26 A. (2d) 849, as follows:

" 'The doctrine [*cy pres*] applies in situations where a testator has evidenced a dominant intent to devote his prop-

erty to some charitable use but the circumstances are such that it becomes impossible to follow the *particular method* he directs, and the courts then sanction its use in some other way which will, as nearly as may be, approximate his general intent. . . . [Italics ours.]

" 'Ordinarily where an organization to which a charitable gift or devise is made is incapable of taking it, the question whether its payment to another organization will be permitted is determined upon the basis of the applicability of the *cy pres* doctrine or doctrine of approximation; and that doctrine will be applied only where the court finds in the terms of the will, read in the light of surrounding circumstances, a *general intent* to devote the property to a charitable use, to which the intent that it go to the particular organization named is secondary. . . .' "

Again, in *Townsend v. Schalkenbach Home for Boys,* 33 Wn. (2d) 255, 205 P. (2d) 345 (1949), we said:

" . . . The doctrine does not mean that some kind of a charitable trust will be enforced every time the testator expresses a charitable intent. The settlor must have had a *broad, general* intent to aid charity as a whole, *or some particular class of charitable objects. His intent must not be narrow and particular.* . . ." (Italics ours.)

The evidence in this case shows that the testator was acquainted with the *modus operandi* of the home. The sole purpose of the home was to aid unwed mothers pregnant with their first child. The trial court found from the terms of the will, read in the light of surrounding circumstances, a broad, general, charitable intent to aid a particular class of persons, namely unwed mothers.

The testimony adduced by appellants themselves clearly supports the trial court's finding. Olive Easterday Mount, one of the heirs, when questioned as to the testator's acquaintanceship with Dr. Saint Clair Osborn, the founder of the home, testified:

"Q. Now, are you able to state whether Mr. Easterday knew Dr. Saint Clair Osborn? A. Yes, he did. Mrs. Osborn was a doctor, a practicing physician, as was her husband. They were old family friends and he was very interested in the work particularly that Mrs. Osborn was carrying on. Q. Now, what work was she carrying on? A. Well, she

was very interested in maternity work; very sympathetic to many of the unfortunate girls."

The testator expressly provided, in paragraph 10, that the *cy-pres* doctrine should be invoked in the event the trust for any reason could not be literally carried out. The following statement from 2A Bogert on Trusts and Trustees 342, 346, § 436, is directly applicable:

"If the settlor has specifically provided that his intent is general, *or that in case of difficulty with the originally planned charity the trustees shall have power to apply the property cy pres, there can be no question of a narrow intent.*" (Italics ours.)

Appellants concede that, under judicial *cy-pres,* a court of equity can substitute beneficiaries if the selectees are similar to those being replaced. It is then pointed out that the three institutions in King county selected by the trial court to replace the home are different in some respects from the home.

Appellants are trying to place the institutions in the role of beneficiaries. The *patients* of the institutions are the beneficiaries and not the *institutions* themselves. Since its creation, the beneficiaries of the trust have been unwed mothers who are pregnant with their first child. Under the judgment of the trial court, the beneficiaries will continue to be unwed mothers pregnant with their first child. The only change that has come about by virtue of the trial court's judgment is in the *means* of administering the trust, *i.e.*, the three King county institutions have replaced the home as the agency through which the patients (unwed mothers) may request funds. The *purpose* of the trust remains the same.

Appellants maintain that the trial court amended the will by providing, in finding of fact No. 12, that the unwed mothers should become eligible for payments *upon admission* to any one of the three named institutions; whereas, under paragraph 10 of the will, they had to be *discharged* from the home before becoming eligible for funds.

Appellants have misread finding No. 12. It states that the unwed mother becomes eligible to participate in the bene-

fits of the trust only *upon discharge* from any of the named institutions.

 We hold that the trial court correctly applied the doctrine of *cy-pres* to uphold the trust in accord with the testator's intent.

 . Respondent has cross-appealed from that portion of the trial court's judgment awarding to appellants their attorneys' fees and statutory costs from the trust corpus.

The trial court's reasoning on this issue is found in the following quotation from its oral decision:

"Now, here the estate is substantially benefited by the most able services of counsel for the Defendants. . . . Further, the defense here is substantial and meritorious, and it is neither a frivolous nor a spur-of-the-moment proposition . . . here the issues raised are most grave, they are issues that would have to be determined before the Bank could with any safety spend another nickel of this trust, and the estate has derived the benefit of counsels' scholarship and energy by the spirited defense to this amended complaint."

We concur in the holding of the trial court. Respondent initiated this action and brought appellants into court involuntarily. By making the proceeding truly adversary, appellants materially aided the trial court in determining the validity of this charitable trust. The situation here is analogous to that presented in *In re Johnson's Estate,* 46 Wn. (2d) 308, 280 P. (2d) 1034 (1955), where we held that the heirs, who had necessarily been brought into court in a proceeding instituted by the executor to construe a will, were entitled to recover reasonable attorney's fees from the corpus of the estate.

The services of appellants' counsel were of benefit to the trust, and it is only just and proper that the trust should bear the expense.

The judgment of the trial court is in all respects affirmed.

WEAVER, C. J., MALLERY, FINLEY, and OTT, JJ., concur.

---

June 28, 1960. Petition for rehearing denied.