<span style="color:red">Electronically Filed
Intermediate Court of Appeals
30306
30-JUN-2011
07:58 AM</span>

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

IN THE MATTER OF THE
ELIZABETH J.K.L. LUCAS CHARITABLE GIFT


NO. 30306


APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(TRUST NO. 08-1-0139)


JUNE 30, 2011


FOLEY, PRESIDING JUDGE, FUJISE AND LEONARD, JJ.


OPINION OF THE COURT BY LEONARD, J.

Petitioner-Appellant Hawaiian Humane Society (**HHS**) appeals from the following judgment and orders of the Circuit Court of the First Circuit, sitting in Probate (**Probate Court**): (1) Order Denying Petition to Approve Land Exchange Free and Clear of Use Restrictions (**Order Denying Petition**), filed on May 18, 2009; (2) Order Denying Petition for Relief from Order Denying Petition to Approve Land Exchange Free and Clear of Use Restrictions and for Entry of Final Judgment, filed on December 21, 2009 (**Order Denying Relief**); and (3) Judgment Pursuant to Order Denying Petition to Approve Land Exchange Free and Clear of

Use Restrictions (**Judgment**), filed on December 21, 2009.[1] In this case, the Probate Court declined to apply the doctrine of *cy pres* to modify a charitable gift of land. The position of all parties on appeal is that the Probate Court erred in failing to apply *cy pres* to approve the proposed land transaction. We agree and, accordingly, vacate the Judgment and remand with instructions.

I.   BACKGROUND

   A.   The Charitable Gift

      The underlying petition in this case stems from HHS's acquisition of an interest in certain land in the Niu Valley, obtained through a charitable gift.[2] On December 28, 1976, Elizabeth J.K.L. Lucas (**Mrs. Lucas**) granted HHS a 50.6183968% undivided interest in the land by way of deed. On December 30, 1982, she conveyed an additional 1.4% undivided interest in the land to HHS by way of a second deed. Both deeds contain the following use restriction:

> [F]or and as a charitable gift, [Mrs. Lucas] does hereby grant, bargain, sell and convey the property hereinafter described unto the HAWAIIAN HUMANE SOCIETY . . . so long as the same shall be used for the benefit of the public for the operation of an educational preserve for flora and fauna, to be made accessible as an educational experience for the public under the control and administration of said Hawaiian Humane Society and its successors and assigns, and, if not so used, then to State of Hawaii and its successors and assigns, for and as a public park.

      Upon Mrs. Lucas's death in 1986, her remaining 47.981603% interest in the land passed through her estate to her daughter, grandchildren, and great-grandchildren (the **Thompsons**), all of whom have resided on the land for many years. The Thompsons formed a Hawai‘i general partnership, Respondent-Appellee Tiana Partners, to which they transferred their interest in the land.

---

   [1]    The Honorable Colleen K. Hirai presided.

   [2]    The land consists of four parcels, identified by Tax Map Key Nos. (1) 3-7-004-001, (1) 3-7-004-002, (1) 3-7-004-020, and (1) 3-7-004-021.

B.    Attempts to Use the Gifted Land

After receiving the land, HHS made numerous attempts to plan a feasible use for the land in furtherance of the deed restrictions.  In consultation with Tiana Partners, HHS considered many different ideas for effectuating the purpose stated in the deeds, but ultimately rejected them as physically or economically unfeasible.

In 2003, HHS commissioned a feasibility study for a proposed low-intensity development that would be accessible to the public.  The study led HHS to conclude that using the land for a public educational preserve would be extremely expensive and impractical.  It would require disrupting the Thompson residences and surrounding neighborhood.

During 2004 and 2005, HHS and Tiana Partners conducted a series of meetings with various community organizations, including the Honolulu Zoo, the Hawai'i Nature Center, and the Department of Education.  The purpose of the meetings was to identify potential uses for the land that would be consistent with the intent of the gift, beneficial to the community, and physically and economically feasible.  Due to the residential character of the surrounding neighborhood, an overriding consideration was maintaining peaceful coexistence with the Thompsons and other residents in the area.  Access to the property was also a key consideration.  The land is remote; much of it is steep; and it is accessible only by two residential roads.  Using either road for public access would have a disruptive impact on the neighboring residents.

The State of Hawai'i (**State**) Department of Land and Natural Resources (**DLNR**) likewise determined that the land was not suitable for use as a public park.  However, it determined that a portion of the land, Parcel 2, was best-suited for watershed and forest reserve purposes.

C.    Land Exchange Agreement

HHS and Tiana Partners began considering other ways to further the intent of the original gift.  On September 11, 2006, after extensive negotiations, they signed a Memorandum of Understanding (**MOU**).  The MOU contemplates a three-way land exchange and sale between HHS, Tiana Partners, and the State. HHS and Tiana Partners agreed to convey their interests in Parcel 2 to the State.  In exchange, the State would release its executory interest in the remaining parcels.  HHS also agreed to convey its interest in the remaining parcels (1, 20, and 21) to Tiana Partners, free and clear of the use restriction, for $1,082,850.[3/]  HHS would use the proceeds to establish a segregated fund known as the "Charles and Clorinda Lucas Educational Fund" (**Educational Fund**).  The principal and interest would be dedicated exclusively to HHS's educational programs. These programs are designed to foster compassion and caring for all life, focusing on the interdependent relationship between animals, humans, and the environment and our role as stewards and caregivers.

The MOU conditioned the proposed land exchange upon: (1) the agreement of the State Board of Land and Natural Resources (**BLNR**); (2) the approval of the Hawai'i Legislature, pursuant to Hawaii Revised Statutes (**HRS**) § 171-50; and (3) the approval of the Probate Court.  At board meetings on December 8, 2006 and December 14, 2007, the BLNR approved in principle the land exchange transaction.  In December of 2007, the Legislature also approved the transaction.

D.    Petition to Approve Land Exchange

On October 28, 2008, HHS filed a Petition to Approve Land Exchange Free and Clear of Use Restrictions (**Petition**) with

---

[3/]    The parties based this purchase price on an appraisal report completed in July of 2005.  The report valued HHS's interest in the land at $462,100 subject to the use restriction, and at $1,703,600 free of the use restriction.  The mid-point between these two values is $1,082,850.

the Probate Court. The Petition sought an order approving the proposed land transaction and eliminating the use restriction on the land. HHS maintained that the Probate Court had authority to modify the terms of the charitable gift because its stated purpose was impracticable and could not reasonably be accomplished.

The Attorney General, acting as *parens patrie*, filed a response to the Petition on November 19, 2008. He stated no objection to the relief sought and affirmed that the use restriction "has been proven demonstrably impracticable or impossible and . . . the relief sought in the petition is fair and reasonable and is consistent with the doctrine of cy pres." The State filed a joinder in the Petition on November 21, 2008. The Administrator of the Division of Forestry and Wildlife of the DLNR filed a declaration attesting that the DLNR had inspected and reviewed the properties described in the Petition. The DLNR "determined that these properties are not presently suitable for use as a public park, and in particular that Parcel 2 is best used for watershed and forest reserve purposes."

Laura Thompson (**Thompson**), Mrs. Lucas's daughter, filed a declaration attesting that Mrs. Lucas would have fully supported the land exchange "as a compromise necessary to further her deep interest in all things natural and her strong commitment to education, which can be accomplished far better through the broad reach of the Hawaiian Humane Society than in a narrow urban valley." She attested that Mrs. Lucas "was actively involved with the Hawaiian Humane Society throughout her life" and served on its Board of Directors. Mrs. Lucas fully supported its mission "to promote the bond between humans and animals and to foster the humane treatment of all animals." Thompson believed her mother was not aware of the obstacles preventing development of the land in accordance with the deeds. She believed her mother's original intent in gifting the land was "to benefit the people of Hawai'i through the work of the Hawaiian Humane

Society" and to "help the Society provide an educational experience for the public."

E.    Probate Court Order and Judgment

Following a hearing, the Probate Court entered the Order Denying Petition on May 18, 2009.  The court stated the following grounds as its basis for the denial:

> 1.  The deeds provide, ". . . for and as a charitable gift, does hereby grant, bargain, sell and convey the property hereinafter described unto the Hawaiian Humane Society, . . . so long as the same shall be used for the benefit of the public for the operation of an educational preserve for flora and fauna, to be made accessible as an educational experience for the public under the control and administration of said Hawaiian Humane Society, . . . and if not so used, then to State of Hawaii, its successors and assigns for and as a public park, . . ."
>
> 2.  Even if the Court finds that the deeds create a charitable trust, the Memorandum of Understanding does not involve the use of the properties as stated in the deeds. The Memorandum of Understanding states that the Petitioner will receive cash in exchange for conveying its interest in the properties and will use the cash ". . . to establish a segregated fund to be known as the 'Charles and Clorinda Lucas Educational Fund,' the principle [sic] and interest of which fund shall be used exclusively to pay the costs associated with educational programs designed to foster compassion and caring for all life, focused on the interdependent relationship between animals, humans and the environment and on our roles as stewards and caregivers."
>
> 3.  Mrs. Lucas' charitable purpose as stated in the deeds is to use the properties for the operation of an educational preserve for flora and fauna, to be made accessible as an educational experience for the public.  The deeds also provide that if the petitioner does not use the properties for the stated charitable purpose, the properties would go to the State of Hawaii.
>
> 4.  The doctrine of *cy pres* does not apply to the Petitioner since the deeds provide for an alternative if the properties are not used by the Petitioner as Mrs. Lucas intended.

On August 3, 2009, HHS filed a petition for relief from the Probate Court's Order Denying Petition.  The Attorney General and Tiana Partners filed joinders in the petition for relief, and the State filed a memorandum of no opposition.  All interested parties agreed that the Probate Court misconstrued the *cy pres* doctrine and that it should have approved the transaction.

On December 21, 2009, the Probate Court entered the Order Denying Relief and the Judgment. HHS timely appealed.

II. POINTS OF ERROR

On appeal, HHS argues that the Probate Court erred in denying the Petition and refusing to modify the terms of the charitable gift to approve the proposed land exchange. Tiana Partners filed an Answering Brief in support of HHS's position. The State filed an Answering Brief expressing its non-opposition and joinder in HHS's request for relief.

III. STANDARDS OF REVIEW

Hawaiʻi courts have not addressed the applicable standard of review for a lower court's refusal to apply the doctrine of *cy pres*. In applying an analogous doctrine to reform the terms of a private trust, the supreme court analyzed the issue as a question of law. In re Estate of Chun Quan Yee Hop, 52 Haw. 40, 45-46, 469 P.2d 183, 186-87 (1970). Other jurisdictions have held that whether *cy pres* applies is a question of law, reviewable *de novo*. See, e.g., Kolb v. City of Storm Lake, 736 N.W.2d 546, 552-53 (Iowa 2007); In re R.B. Plummer Memorial Loan Fund Trust, 661 N.W.2d 307, 311 (Neb. 2003); Puget Sound Nat'l Bank of Tacoma v. Easterday, 350 P.2d 444, 447 (Wash. 1960); ABC for Health, Inc. v. Comm'r of Ins., 640 N.W.2d 510, 515 (Wis. Ct. App. 2001). Accordingly, we hold that the issue of whether the doctrine of *cy pres* is applicable is a question of law, reviewable *de novo*. Once *cy pres* is determined to be applicable, the lower court has discretion in determining the appropriate modification of the charitable gift. Obermeyer v. Bank of America, N.A., 140 S.W.3d 18, 22 (Mo. 2004).

IV.  DISCUSSION

    A.  *Cy Pres* Generally

        The doctrine of *cy pres* "permits a gift for a charitable purpose which cannot, for one reason or another, be carried out as directed by the donor, to be applied 'as nearly as may be' to the fulfillment of the underlying charitable intent." 15 Am. Jur. 2d Charities § 149 (2011) (**Am. Jur. 2d**).[4] Under the doctrine's traditional formulation, three elements are required: (1) there must be property given in trust for a charitable purpose; (2) it must be impossible, impracticable, or illegal to carry out the specified charitable purpose; and (3) the settlor must have manifested a general intent to devote the property to charitable purposes.[5] Id.

        Hawai'i courts have not directly addressed or applied the *cy pres* doctrine.  However, the supreme court has recognized the doctrine in dictum.  Chun Quan Yee, 52 Haw. at 45, 469 P.2d at 186.  It noted that "[i]f it is impossible, impractical or illegal to carry out the specific terms of a charitable trust in which the settlor has indicated a general charitable purpose, many courts will authorize the substitution of another charitable scheme within the testator's general purposes." Id.  The court went on to apply an analogous doctrine to save a private trust from failing due to its contravention of the Rule Against Perpetuities.  Id. at 45-46, 469 P.2d at 186-87.

---

    [4]    The term *cy pres* originates from the French phrase *cy pres comme possible*, meaning "so nearly as may be."  Am. Jur. 2d § 149.

    [5]    The Restatement (Second) of Trusts § 399 (1959) (**Restatement 2d**) sets forth the doctrine as follows:

> If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor.

*Cy pres* is only applicable to charitable trusts.[6] Restatement (Third) of Trusts § 67, cmt. a (2003) (**Restatement 3d**); Am. Jur. 2d § 149. Various policy considerations underlie its application. First and foremost, the doctrine stems from the inability of charitable settlors to foresee the future. Restatement 3d, Reporter's Notes, cmt. a (recognizing that without *cy pres*, "many charities would fail by change of circumstances and the happening of contingencies which no human foresight could provide against"). Circumstances change and contingencies frequently arise that the settlor did not or could not anticipate. This is particularly true for charitable trusts, as they may be perpetual in duration. Id.; Ronald Chester, George Gleason Bogert, and George Taylor Bogert, The Law of Trusts & Trustees § 431, at 117 (3d ed. 2005) (**Bogert on Trusts**). The "needs and circumstances of society evolve over time," impacting the potential benefit of the trust. Restatement 3d § 67, cmt. a. Rather than allowing the trust to fail, *cy pres* preserves the settlor's charitable intent by conforming the trust

---

[6] A trust arises whenever property is conveyed to be held for the benefit of another. Ako v. Russell, 32 Haw. 769, 770 (1933); accord In re Damon Estate, 76 Hawai'i 120, 125 n.4, 869 P.2d 1339, 1344 n.4 (1994). A charitable trust arises when the property is given "for a purpose beneficial to a community[.]" Banner Health System v. Long, 663 N.W.2d 242, 247 (S.D. 2003); accord Austin Wakeman Scott et al., Scott and Ascher on Trusts § 38.1.2, at 2502 (5th ed. 2006) (**Scott on Trusts**). No technical language or separate trust instrument is required. Ako, 32 Haw. at 770. If it appears from the whole instrument that the donor intended the property "to be held or dealt with for the benefit of another, a court of equity will affix to it the character of a trust[.]" Id. A trust arises so long as the subject matter, beneficiaries, and terms are "reasonably certain as to be capable of enforcement." Damon Estate, 76 Hawai'i at 125 n.4, 869 P.2d at 1344 n.4. Here, the deeds conveyed property to HHS (or alternatively to the State) for the use and benefit of the public for charitable purposes.

to the contingencies that arise.[2/] Thus "[j]ust as it is against the policy of the trust law to permit wasteful or seriously inefficient use of resources dedicated to charity, trust law also favors an interpretation that would sustain a charitable trust and avoid the return of the trust property to the settlor or successors in interest." Id. at cmt. b. Similarly, because charitable trusts impact a broad spectrum of the public and "are allowed by the law to be perpetual," they often merit a greater exercise of judicial discretion than a private trust. Id. at Reporter's Notes, cmt. a.

Courts widely recognize that the charitable purpose need not be impossible to warrant applying *cy pres*. It is sufficient that achieving the settlor's stated purpose would be impracticable or unreasonable to effectuate. Restatement 3d § 67, cmt. c ("The doctrine of *cy pres* may also be applied, even though it is *possible* to carry out the particular purpose of the settlor, if to do so would not accomplish the settlor's charitable objective, or *would not do so in a reasonable way*.") (second emphasis added); Bogert on Trusts § 438, at 194-96 (recognizing insufficiency of funds as basis for doctrine); Scott on Trusts § 39.5.2, at 2717-20; § 39.5.4, at 2740-41; Am. Jur. 2d § 151 (doctrine is applicable where donor's directions "*cannot beneficially* be carried into effect") (emphasis added; punctuation altered). "An impractical restriction is one that is

---

[2/]    One commentator reasons that *cy pres* comports with most settlors' probable intentions:

> [S]ince no one can foresee the future, a rational donor
> knows that his intentions might eventually be thwarted by
> unpredictable circumstances and may therefore be presumed to
> accept implicitly a rule permitting modification of the
> terms of the bequest in the event that an unforeseen change
> frustrates his original intention.

Restatement 3d § 67, Reporter's Notes, cmt. b (quoting Richard A. Posner, Economic Analysis of Law 556-57 (5th ed. 1998)).

not capable of being carried out in practice." Am. Jur. 2d § 157. If literal compliance would "defeat or substantially impair" the purposes of the trust, *cy pres* is applicable. Restatement 2d § 399, cmt. a. The purpose of the trust becomes impaired if "the application of [trust] property to such purpose would not accomplish the general charitable intention of the settlor." 88 Am. Jur. Proof of Facts 3d 469, § 10 (2006) (**Am. Jur. Proof of Facts 3d**).

Thus, *cy pres* is applicable where a settlor creates a charitable trust of real property to be used for a particular purpose, but the property turns out to be unsuitable for that purpose. See Scott on Trusts § 39.5.2, at 2724-25; Roberds v. Markham, 81 F. Supp. 38, 40 (D.C. 1948) (recognizing that courts may order sale of gifted land if conditions have drastically changed or land otherwise becomes unsuitable for its dedicated purpose); Bd. of Educ. of Rockford v. City of Rockford, 24 N.E.2d 366, 369-73 (Ill. 1939) (applying *cy pres* to allow sale of land in charitable trust where its dedicated use as school became impracticable due to shifting populations, deterioration of existing building, and existence of another school that met needs of the area). In one case, for example, a settlor gifted certain land to a charity for the purpose of building a public library upon the land. Bosson v. Woman's Christian Nat'l Library Ass'n, 225 S.W.2d 336, 337 (Ark. 1949). The land turned out to be unsuitable for constructing a library. Id. The charity reached an agreement with a county library board under which it would sell the land and use the proceeds to build a public library upon property owned by the county board. Id. The board agreed to operate the library for the benefit and use of the public. Id. at 337-38. On appeal, the court applied *cy pres* to approve the transaction. Id. at 338-39. It noted that *cy pres* applies where the circumstances "have changed to such an extent that in order

to carry out properly the charitable intention of the donor, it is necessary to dispose of the trust property and devote the funds to the acquisition of a more suitable location[.]" Id. at 338 (internal quotation marks and citation omitted).

Similarly, a California court applied cy pres where the stated purposes of the gifted properties became impracticable. In re Estate of Zahn, 93 Cal. Rptr. 810 (Cal. Ct. App. 1971). There, the testatrix left two residential properties to the Salvation Army. Id. at 811. She directed the Flower Street property to be used as a home for Christian women, and the Keniston Avenue property as a music home. Id. After her death, the Flower Street property was taken pursuant to eminent domain and the Keniston Avenue property was deemed unsuitable for development due to zoning issues. Id. at 813. The Salvation Army proposed to use the funds from the Flower Street property to erect and furnish a new building on a different site. Id. It further proposed to sell the Keniston Avenue property and use the proceeds to either construct a music conservatory on another site or endow a music room under construction at another Salvation Army center. Id.

The court confirmed that cy pres was applicable. Id. at 814. It concluded that because neither property was suitable for carrying out the testatrix's declared intentions, the lower. court "properly directed that her charitable purposes be given effect at some other suitable locations." Id.; see also Bogert on Trusts § 439, at 218-20 (noting that cy pres is applicable where trust property is taken under eminent domain).

The third element -- general charitable intent -- has been a source of uncertainty and reform. Under the traditional rule, cy pres may only be applied if the settlor possessed a general charitable intent. Am. Jur. 2d § 153. His or her intent must have encompassed "something beyond the specific terms used

in designating the beneficiary or purpose of the gift or how it shall be carried into effect." Id.; see also Restatement 2d § 399; Bogert on Trusts § 431, at 119; § 436, at 157-60. The donor must have had a general charitable intent, as opposed to a narrow intent to benefit only a "particular project, objective, or institution[.]" Am. Jur. 2d § 153. For example, where a settlor's dominant intent is to restrict the charitable gift to the *exact* purpose specified, courts may presume that the donor would not have wanted the property to be applied to any other purpose, however closely related, even if the original purpose fails. Restatement 2d § 399, cmt. d.[8] In such situations, *cy pres* is not applicable because the settlor did not have a general charitable intent. Id.; see also Shoemaker v. Am. Sec. & Trust Co., 163 F.2d 585, 588 (D.C. Cir. 1947) (noting that *cy pres* does not apply if settlor's "dominant purpose has become altogether impossible of achievement"). In contrast, if the settlor's designation of a particular property or site is incidental to the dominant charitable purpose, then courts will presume that the settlor's primary intent was to dedicate the property to charitable purposes. Shoemaker, 163 F.2d at 589; see also In re Wilkey's Estate, 10 A.2d 425, 428 (Pa. 1940) (recognizing that *cy pres* applies where "the physical location of the edifice or institution provided for in a charitable trust has been held to be of secondary importance in comparison with the general purpose for which the erection of the building or the carrying on of the charitable activity was designed"). In such cases, *cy pres* is readily applicable to effectuate the settlor's general charitable intent. Shoemaker, 163 F.2d at 589.

---

[8] Despite requiring a general charitable intent, the Second Restatement notes that *cy pres* allows sale of the subject property even if "the settlor in specific words directed that the land should not be sold and that the institution should not be maintained in any other place." Restatement 2d § 399, cmt. p.

Increasingly, the "general charitable intent" requirement has shifted to an "opt-out" framework under which the settlor is presumed to have a general charitable intent unless the terms of the trust provide otherwise. See Restatement 3d § 67, cmt. b; Reporter's Notes, cmt. b;[9] UNIF. TRUST CODE § 413(a), 7C U.L.A. 509 (2006); Bogert on Trusts § 436, at 160 (noting that "it would seem preferable" either to employ presumption in favor of general intent or apply *cy pres* regardless of whether settlor's charitable intent was general or specific); but see Am. Jur. Proof of Facts 3d § 6 (noting that "presumption of general charitable purpose has not yet been discussed in the reported decisions").[10] Commentators have noted that the "general intent" requirement is vague and difficult to apply consistently. Ronald Chester, Cy Pres or Gift Over?: The Search for Coherence in

---

[9] The Third Restatement of Trusts provides:

*Unless the terms of the trust provide otherwise*, where property is placed in trust to be applied to a designated charitable purpose and it is or becomes unlawful, impossible, or impracticable to carry out that purpose, or to the extent it is or becomes wasteful to apply all of the property to the designated purpose, the charitable trust will not fail but the court will direct application of the property or appropriate portion thereof to a charitable purpose that reasonably approximates the designated purpose.

Restatement 3d § 67 (emphasis added).

[10] A number of courts have employed a presumption in favor of a general charitable intent. Smith v. Moore, 225 F. Supp. 434, 441-42 (E.D. Va. 1963) ("[C]haritable gifts are viewed with peculiar favor by the courts and every presumption consistent with the language contained in the instruments of gift will be employed in order to sustain them. All doubts will be resolved in their favor."); accord Trammell v. Elliott, 199 S.E.2d 194, 198-99 (Ga. 1973); In re Kraetzer's Will, 462 N.Y.S.2d 1009, 1013 (N.Y. Surr. Ct. 1983) ("[A]bsent an express divesting condition, cy pres is almost invariably applied."); Georgia O'Keeffe Found. (Museum) v. Fisk Univ., 312 S.W.3d 1, 17 (Tenn. Ct. App. 2009) ("[C]ourts generally favor a finding of general charitable intent, and absent an express divesting condition, cy pres is almost invariably applied.") (internal quotation marks, citations, and emphasis omitted). To date, twenty-three states have enacted the Uniform Trust Code, including its presumption in favor of a general charitable intent. UNIF. TRUST CODE § 413, 7C U.L.A. 509, cmt.; see Uniform Law Commission Enactment Charts, available at http://www.nccusl.org/Act.aspx?title=Trust%20Code.

Judicial Reform of Failed Charitable Trusts, 23 Suffolk U. L. Rev. 41, 45-46 (1989); accord Bogert on Trusts § 436, at 159-60; § 437, at 183-89 (noting widespread inconsistency in applying this requirement). It turns on a fine, and often subjective, distinction between a settlor's dominant and incidental or subsidiary objectives. See Bogert on Trusts, § 437 at 183-89. In contrast, the opt-out rule provides a clearer delineation that avoids guesswork as to the subtleties of the settlor's intent.

Finally, in applying *cy pres*, courts must generally seek a purpose that conforms to the donor's objective "as nearly as possible." Am. Jur. 2d § 157. This may be attained by limiting or modifying the objective; by diverting the funds to another use in the "same generally contemplated field"; or by directing sale of the subject property. Id.; Am. Jur. Proof of Facts 3d § 10; Restatement 2d § 399, cmt. p (*cy pres* allows sale of land even if "the settlor in specific words directed that the land should not be sold and that the institution should not be maintained in any other place"). In the case of a sale, the proceeds may be applied to purchase a new, more suitable site, or to further the settlor's charitable intent in another manner. See Am. Jur. Proof of Facts 3d § 21. Where a charitable gift of property is subject to use restrictions, the court may apply *cy pres* to modify or eliminate those restrictions. Id. at § 22; Bogert on Trusts § 431, at 115; Scott on Trusts § 39.5.2, at 2716.

In determining the appropriate modification, courts must consider a variety of factors and evidence to ascertain what the settlor's wishes would have been had he or she anticipated the circumstances. Restatement 3d § 67, cmt. d. Chief among them is the settlor's probable intent. Id. Where the settlor is deceased, this intent may be discerned from extrinsic evidence as well as the language of the trust instrument. Such evidence

includes the interests and attitudes that motivated the settlor's gift; his or her involvement or interest in particular charitable institutions; and the settlor's "relationships, social or religious affiliations, personal background, charitable-giving history, and the like." Id.; accord Bogert on Trusts § 442, at 257-58. The language of the trust instrument is also pertinent. Restatement 2d § 399, cmt. d.

The modern approach to *cy pres* also emphasizes considering the efficiency and beneficial impact of the proposed use. Restatement 3d § 67, cmt. d. As the settlor's intent cannot be known for certain, applying *cy pres* necessarily involves some level of speculation. Id.; accord Scott on Trusts § 39.5.2, at 2709 (noting that courts must make "an educated guess" as to settlor's wishes). Thus, it is generally "reasonable to suppose that among relatively similar purposes, charitably-inclined settlors would tend to prefer those most beneficial to their communities." Restatement 3d § 67, cmt. d (emphasis omitted; punctuation altered). To an increasing extent, courts thus seek to apply the trust property toward "a scheme which on the whole is best suited to accomplish the general charitable purpose of the donor." Restatement 2d § 399, cmt. b. Finally, the wishes of the trustees, the Attorney General as *parens patrie*, the beneficiaries, and other interested parties also warrant consideration. Id. at cmt. f; Bogert on Trusts § 442, at 258.

B.  Gift over Rule

Having established the broad contours of the *cy pres* doctrine, we now turn to the heart of the issue on appeal: whether the Probate Court erred in concluding that *cy pres* is not applicable in this case. The Probate Court reasoned that *cy pres* does not apply because the deeds provide an alternative distribution in the event that the primary charitable purpose

fails.  It concluded that "if [HHS] does not use the properties for the stated charitable purpose, the properties would go to the State of Hawaii."

The Probate Court's rationale appears to invoke the gift over rule.  A gift over is a provision that sets forth an alternative distribution in the event that the primary purpose of the charitable gift fails.  Am. Jur. 2d § 151.  The presence of a gift over provision may potentially preclude application of cy pres in two ways:  (1) by negating the existence of a general charitable intent, and (2) by providing an alternative distribution in the event that the settlor's original purpose fails.  Restatement 2d § 399, Reporter's Notes, cmt. c; Am. Jur. 2d § 151; Scott on Trusts § 39.5.2, at 2710-13; § 39.7.5, at 2795-97; 14 C.J.S. Charities § 56 (2011).

The first application of the gift over rule is only relevant to the traditional requirement that the settlor exhibit a general charitable intent.[11/]  Under this reasoning, the gift over confirms the settlor's narrow and specific intent.  14 C.J.S. Charities § 56.  This is especially true where the gift over is to a non-charity, such as a possibility of reverter. Nelson v Kring, 592 P.2d 438, 444 (Kan. 1979); In re Goehringer's Will, 329 N.Y.S.2d 516, 521 (N.Y. Surr. Ct. 1972) (noting that presence of gift over provision "is a clear manifestation that [the] testator had a particular rather than general charitable intention"); Roberds, 81 F. Supp. at 40-42 (concluding that because deed contained possibility of reverter if land ever ceased to be used for its prescribed purpose, settlor's intent was specific to that purpose).  Such a provision indicates that the settlor only wished to dedicate the property to a specific

---

[11/]    As noted above, this requirement has increasingly been replaced by a clearer, opt-out framework under which the settlor is presumed to have a general charitable intent unless the trust instrument indicates otherwise. See supra part IV(A).

purpose and, if that specific purpose failed, to not dedicate it to charity at all. In re Goehringer's Will, 329 N.Y.S.2d at 521 ("[A] specific gift over will almost conclusively preclude any determination that he had other than an intent to benefit the particular charity.").

In contrast, where the gift over is to another charity or charitable purpose, many courts recognize that it confirms a general charitable intent. See Bogert on Trusts § 437, at 165-70; Scott on Trusts § 39.5.2, at 2713; First Nat'l Bank of Chicago v. Elliott, 92 N.E.2d 66, 74 (Ill. 1950). Such a provision illustrates the settlor's intent to dedicate the property to charity, even if the original purpose fails. Bogert on Trusts § 437, at 165-70.

Here, the deeds provide an alternative charitable purpose: for the land to be used by the State as a public park. Under the traditional formulation of the charitable intent requirement, the gift over in this case confirms Mrs. Lucas's general charitable intent. Thus, regardless of the continuing viability of the general intent requirement, the gift over provision does not prevent application of cy pres under the first rationale.

In any event, it does not appear that the Probate Court applied the first rationale of the gift over rule. The Order Denying Petition contains no mention of general charitable intent. Instead, the Court's reasoning conforms to the second rationale. It concluded that because the deeds direct an alternative distribution, cy pres is inapplicable.

This second application of the gift over rule provides that cy pres is inapplicable as the trust property should be applied toward its alternative purpose. 14 C.J.S. Charities § 56. The rule reasons that the settlor foresaw the potential failure of the first purpose and accordingly provided an

alternative purpose. Id. Thus, effectuating the alternative distribution matches the settlor's intent more closely than applying *cy pres* to maintain the first, failed purpose.

A number of cases affirm the straightforward application of this rule. In Roberds v. Markham, for example, the settlor conveyed property in trust to a church for its continuing operation as a church or place of worship. 81 F. Supp. at 39. The deed provided that if the property ever ceased to be used for church purposes, it would revert to the settlor's heirs and assigns. Id. Many years later, when the character of the surrounding neighborhood had changed and the church's population had shifted, the trustees sought to sell the property and re-erect the church at another, more suitable location. Id. The court concluded that because the deed contained a possibility of reverter, the settler had intended the land to revert to her heirs and assigns if its use as a church ever became impracticable or impossible. Id. at 40-42. It therefore did not apply *cy pres* to permit the sale. Id. at 42; see also First Nat'l Bank of Chicago v. Am. Bd. of Comm'rs for Foreign Missions, 66 N.E.2d 446, 448-49 (Ill. Ct. App. 1946) (declining to apply *cy pres* where will impliedly provided for substitute distribution); accord Conn. Bank & Trust Co. v. Cyril and Julia C. Johnson Mem'l Hosp., 294 A.2d 586, 591-93 (Conn. 1972); Hail v. Cook, 294 S.W.2d 87, 88-89 (Ky. 1956).

Yet this application of the gift over rule is subject to an important caveat. Where the alternative distribution is unfeasible, impracticable, or impossible, then the gift over rule does not preclude the application of *cy pres* to save the first charitable purpose. Am. Jur. Proof of Facts 3d § 19; 14 C.J.S. Charities § 56; Restatement 3d § 67, cmt. b. In such cases, applying the alternative purpose would likewise frustrate or

substantially impair the settlor's intent. *Cy pres* is thus necessary to save the trust from failure.

It appears that only one reported case has addressed this relatively rare scenario. Burr v. Brooks, 393 N.E.2d 1091 (Ill. Ct. App. 1979), aff'd, Burr v. Brooks, 416 N.E.2d 231 (Ill. 1981). In Burr, the testator bequeathed certain real property and funds to the City of Bloomington for the construction and operation of a memorial hospital. Id. at 1093. The will directed the hospital to be constructed on the site where the testator had resided. Id. It was to be operated especially for the benefit of indigent accident victims. Id. The will also directed an alternative distribution in the event that the City declined the bequest. Id. The substitute purpose required the trustees to construct and maintain an "Industrial School for Girls" on the site of his former residence. Id.

The City adopted a resolution purporting to accept the bequest. Id. at 1094. However, it determined that the site was not suitable for construction of a hospital, that there were already sufficient hospitals in the area, and that it could not obtain the requisite permission from governing authorities. Id. It thus sought to sell the real property and apply the proceeds and remaining funds toward three related purposes that were more suitable to the City's present needs: (1) to provide health care for indigent persons; (2) to establish a memorial family care and diagnostic center that would offer free services to indigent persons; and (3) to establish an emergency medical services program. Id.

The intervenors, the city school district and a non-profit successor to the county Women's Industrial Home, opposed application of *cy pres* on the basis that the will provided for an alternative charitable distribution. Id. They maintained that because the first purpose was impracticable, the court should

apply the funds toward housing and educational programs in conformance with the alternative distribution.  Id.

The parties agreed that neither proposed use of the property effected literal compliance with the will; both the primary and alternative distributions were impracticable or impossible.  Id. at 1095.  Because the alternative distribution was also impracticable, the presence of the gift over provision did not defeat application of the cy pres doctrine.  Id. at 1095, 1097.  The court noted that it would "make[] no sense" to apply the gift over rule in cases where the alternative distribution, like the primary one, is incapable of literal performance.  Id. at 1097.  It concluded that cy pres is applicable where a trust instrument "(1) provides for a primary and alternate charitable gift, neither of which can be carried out, and (2) also indicates a strong desire that the charitable interest of the document be followed."  Id. at 1097 (punctuation altered).  The appellate court thus held that the trust property should not be summarily redirected to its alternative distribution because the alternative beneficiaries, "like the City, would be unable to comply with the terms of either charitable gift and could also make only a [c]y pres use of the property."  Id.  It remanded for the lower court to apply cy pres and determine which proposed use "most nearly follow[s] the interest of the [testator]."  Id. at 1098.

Burr v. Brooks thus recognizes that where the settlor provides for an alternative charitable distribution, but that secondary purpose is also impracticable or impossible, cy pres may apply to save the first.  See Am. Jur. Proof of Facts 3d § 19 ("Where the donor provides that on failure of the primary charitable purpose the gift shall be used for a second charitable purpose, but makes no provision concerning the failure of the second purpose, and both purposes fail, cy pres may be applied.")

(citing <u>Burr v. Brooks</u>); <u>accord</u> 14 C.J.S. <u>Charities</u> § 56 ("Where the donor provides that on failure of the primary charitable purpose, the gift will be used for a second charitable purpose, but makes no provision concerning the failure of the second purpose, and both purposes fail, cy pres may be applied.") (citing <u>Burr v. Brooks</u>). As one commentator recognized, if the alternative distribution "requires cy pres in order to be viable, the presumption for saving the initial gift is strengthened. This is because the second gift's only practical advantage over the first -- that it can be plugged in automatically -- no longer remains." Chester, <u>Cy Pres or Gift Over?</u>, 23 Suffolk U. L. Rev. at 62 (citing <u>Burr v. Brooks</u>). The Third Restatement of Trusts has also expressly adopted this approach:

> A trust provision expressing the settlor's own choice of an alternative charitable purpose will be carried out, without need to apply the cy pres doctrine, assuming not only that the initially specified purpose cannot be given effect or continued *but also that the alternative purpose is one that properly can be given effect.*

<u>Restatement 3d</u> § 67, cmt. b (emphasis added).

The approach expounded in <u>Burr v. Brooks</u> comports with the policies underlying *cy pres*. Fundamentally, the doctrine exists to save a charitable trust from failure while preserving the settlor's original, charitable intent. <u>Restatement 3d</u> § 67, cmt. b. Thus where both the primary and alternative charitable distributions are impracticable, courts may presume that the settlor would have intended one or both purposes to survive under application of *cy pres*.

Here, the deeds provide that if the first purpose -- an educational nature preserve operated by HHS -- fails, the property passes to the State "for and as a public park."[12/] This

---

[12/] The Probate Court concluded that the "deeds also provide that if the petitioner does not use the properties for the stated charitable purpose, the properties would go to the State of Hawaii." However, the deeds do not
(continued...)

secondary purpose, however, is likewise impracticable.  The DLNR
determined that the land was unsuitable for use as a public park,
and that only a portion of the land could be used as a forest
preserve and watershed.  Thus, the Legislature approved the
proposed land exchange, and the State filed a joinder in HHS's
Petition.  Redirecting the land to the State would not effectuate
Mrs. Lucas's charitable intent.  Rather, it would result in the
failure of the trust.  As in <u>Burr</u>, both the primary and
alternative purposes of the gift are impracticable, as the land
cannot feasibly be used for either purpose.  <u>Burr</u>, 393 N.E.2d at
1095.  The Probate Court therefore erred in concluding that the
gift over rule precludes application of *cy pres*.[13]

_____

[12] (...continued)
provide an outright transfer to the State for any purpose.  Rather, they
phrase the alternative distribution as a limited one, "to State of Hawaii and
its successors and assigns, *for and as a public park*."  (Emphasis added.)

[13]    The Probate Court also concluded that *cy pres* is inapplicable
because the proposed land transaction and use of the proceeds "does not
involve the use of the properties as stated in the deeds."  However, *cy pres*
necessarily involves modifying the settlor's stated purpose and restrictions
for the trust property.  <u>Scott on Trusts</u> § 39.5, at 2697; <u>Restatement 2d</u> §
399, cmt. a (*cy pres* permits "application of the trust property to a different
charitable purpose from that designated by the settlor"); <u>Restatement 3d</u> § 67,
cmt. d.

        HHS also argues that the Probate Court may approve the land
exchange transaction, without applying *cy pres*, under the doctrine of
equitable deviation.  That doctrine, however, only allows modification of
administrative terms of the trust.  Am. Jur. 2d §§ 155-56; <u>Restatement 3d</u>
§ 67, cmt. b (noting that equitable deviation "modif[ies] *the means* by which
the purpose is to be accomplished) (emphasis added).  Where the proposed
modification impacts the charitable purpose, the doctrine is inapplicable.
Am. Jur. 2d § 155; Am. Jur. <u>Proof of Facts</u> 3d § 7 (noting that equitable
deviation permits trustees to deviate "from the mechanical means" of
administering the trust); <u>Burr</u>, 393 N.E.2d at 1096-97 (holding that equitable
deviation was not applicable where trustees sought to sell subject property
and apply proceeds toward different, though closely related, purpose).  Here,
because the proposed modification alters the use of the properties, it does
not merely pertain to an administrative provision of the gift, but rather to
its charitable purpose.  *Cy pres*, and not equitable deviation, is thus
applicable.

C.    *Cy Pres* Applies to Approve the Proposed Land Exchange

HHS, Tiana Partners, and the State request this court to remand the case with instructions to apply *cy pres* to approve the proposed land exchange free and clear of the use restrictions.  We agree that *cy pres* so applies in this case.

As discussed above, *cy pres* applies where:  (1) property is given in trust for a charitable purpose; (2) it is impracticable to carry out the specified charitable purpose; and (3) the settlor manifested a general intent to devote the property to charitable purposes.  <u>Supra</u> part IV(A).  Here, those elements are met.  Mrs. Lucas conveyed the land to HHS for charitable purposes for the use and benefit of the public.  The parties do not dispute, and the evidence readily establishes, that Mrs. Lucas's specified purposes for the land are both impracticable.

The conveyance also satisfies the traditional requirement of general charitable intent.  In determining whether the settlor possessed a general charitable intent, courts consider the language of the instrument, the nature and duration of the gift, the character of the recipient organization, the presence or absence of a reversionary clause, and the mode for effectuating the gift.  Am. Jur. 2d § 154.  Courts may also consider extrinsic evidence of the settlor's probable intent.  Am. Jur. <u>Proof of Facts</u> 3d § 20; <u>accord</u> <u>Bogert on Trusts</u> § 437, at 160-73.  If the settlor intended the gift to "be continued within the limits of its general purpose" rather than cease upon the failure of its specific purpose, this constitutes a general intent.  <u>Obermeyer</u>, 140 S.W.3d at 24.  Gifts in support of educational goals often demonstrate a general charitable intent because there is a perpetual need and use for them.  <u>Id.</u>; <u>accord</u> <u>Bogert on Trusts</u> § 436, at 157.

In this case, the deeds convey the land "for and as a charitable gift" for the purpose of educating the public. They specify an alternative means of achieving the charitable purpose in the event the first method fails. The deeds thus confirm that Mrs. Lucas did not intend the trust to fail should use of the land become impracticable. See Bogert on Trusts § 437, at 165-70 (gift over to another charitable purpose confirms general charitable intent); accord Scott on Trusts § 39.5.2, at 2713; First Nat'l Bank of Chicago, 92 N.E.2d at 74. The declaration of Mrs. Lucas's daughter, evidencing Mrs. Lucas's probable wishes regarding the property had she been alive, further supports a general charitable intent.

Finally, the proposed land exchange closely conforms to Mrs. Lucas's original purpose. The deed restriction contemplates a nature preserve to function "as an educational experience for the public." Mrs. Lucas's daughter attested that her mother intended to generally benefit the people of Hawai'i by enabling HHS to provide "an educational experience for the public." The Educational Fund preserves those goals by promoting educational programming that focuses on the natural environment. This use of the funds also comports with Mrs. Lucas's lifelong interest and involvement with HHS. It accomplishes her probable wishes regarding the use of the land had she been aware of the obstacles preventing its development. Unlike in Burr v. Brooks, the interested parties all agree that the proposed land exchange effectuates Mrs. Lucas's charitable intent as nearly as possible. Cf. Burr, 393 N.E.2d at 1095. This unanimous accord further supports applying cy pres to approve the transaction. See Restatement 2d § 399, cmt. f; Bogert on Trusts § 442, at 258 (recognizing that wishes of trustees, beneficiaries, attorney general, and other interested parties warrant consideration).

25

There is no evidence, either extrinsic or in the deeds themselves, to support a contrary conclusion.

V.   CONCLUSION

For these reasons, we conclude that the Probate Court erred in concluding that *cy pres* is not applicable to approve the proposed transaction on the basis that the deeds provide for an alternative distribution.  Accordingly, we vacate the Judgment and remand to the Probate Court to apply *cy pres* consistent with this Opinion.

On the briefs:

Nicholas C. Dreher
Rhonda L. Grisworld
Marion L. Reyes-Burke
(Cades Schutte LLP)
for Petitioner-Appellant

Randall L. Ishikawa
Deputy Attorney General
State of Hawaiʻi
for Respondent-Appellee